## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PREMIER COMP SOLUTIONS, LLC | ) ) ) | CASE NO.: 2:2015-cv-00703-DSC |
| Plaintiff | ) ) | |
| v | ) ) | |
| UPMC, a Pennsylvania nonprofit non-stock corporation, UPMC BENEFIT MANAGEMENT SERVICES, INC., d/b/a UPMC WORKPARTNERS, UPMC HEALTH BENEFITS, INC. d/b/a UPMC WORKPARTNERS, and MCMC, LLC, a wholly-owned subsidiary of York Risk Management | ) ) ) ) ) ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants | ) ) ) | |

## <u>AMENDED COMPLAINT</u>

And now comes Plaintiff above-named, Premier Comp Solutions, LLC, and by its Counsel, Stanley M. Stein, Esquire, and Jeffrey S. Jacobovitz, Esquire, and Arnall Golden Gregory, submits the within Amended Complaint:

## I.    <u>INTRODUCTION</u>

This is an antitrust and unfair competition case directed at the anti-competitive practices in the sale of workers compensation cost containment services, among other things, by the Defendants.  Taking advantage of the monopoly market power of one of the Defendants, UPMC, Defendants have engaged in a conspiracy to drive Plaintiff from the marketplace by engaging in anti-competitive practices, fraud and misrepresentation and other conduct. The goal of this conduct, among other things, is to take monopoly control of

the market of providing workers compensation cost containment services and solutions to employers insured by UPMC Health Benefits against workers compensation expenses and employers who are self-insured for workers' compensation expenses and who use the services of third party administrators ("TPA") to administer their workers compensation program.

Plaintiff is a provider of workers' compensation cost containment services, as described below, to insured and self-insured employers in Pennsylvania and other states. As set forth in greater detail below, Plaintiff is being driven from the market as a result of the anti-competitive conduct of Defendants. In addition, there is harm to competition and to consumers in the relevant markets.

## II.      JURISDICTION AND VENUE

1.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337, because this action arises under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over any state cause of action set forth herein.  The Court has personal jurisdiction over each of the Defendants under Section 12 of the Clayton Act, 15 U.S.C. § 22. This Court further has jurisdiction under 15 U.S.C. §§4, 14 and 15.

2.  Defendants, UPMC, UPMC Benefit Management Services, Inc., d/b/a UPMC WorkPartners, UPMC Health Benefits, Inc. d/b/a UPMC WorkPartners and MCMC directly or by their agents, may be found in and transact business in this district. 15 U.S.C. § 22.

3.  Venue is proper in this district under 15 U.S.C. § 22 and 28 U.S.C. § 1391, because Plaintiff's offices  are located in this district and Defendants maintain registered offices, have agents, transact business and/or are found in this district and a substantial part of

the events giving rise to the claims occurred in this Judicial District.

III.   **PARTIES:**

4. Plaintiff, Premier Comp Solutions, LLC ("PCS" or "Plaintiff") is a limited liability company organized under the laws of the Commonwealth of Pennsylvania with its offices located in Allegheny County, Pennsylvania.

5. Defendant, UPMC ("UPMC") is a Pennsylvania nonprofit, non-stock corporation organized under the laws of the Commonwealth of Pennsylvania with offices located in Allegheny County, Pennsylvania.

6. UPMC does business as University of Pittsburgh Medical Center and is also known as UPMC Health System.

7. UPMC has monopoly power, or significant market power in the health care industry in Western Pennsylvania, owning and controlling more than seventy (70) percent of the hospital beds in that geographical market area.

8. UPMC also has significant market power in the purchase of cost containment services.

9. UPMC owns more than 20 hospitals with more than 5100 licensed beds.

10. UPMC has more than 400 clinical locations in western Pennsylvania.

11. UPMC has 5500 affiliated physicians, including 3500 who are directly employed by UPMC.

12. Over the past several years, UPMC has grown substantially through the merger or acquisition of a variety of hospital and non-hospital based medical service providers.

13. With an approximate $10.6 billion asset base, UPMC is the area's largest employer and is a significant force in the local economy.

14. UPMC further owns forty-nine (49) percent of four occupational medicine/urgent care clinics of a company named Concentra, a provider of medical services to employees with work-related injuries or illnesses. Concentra conducts business in interstate commerce. Concentra is a subsidiary of Select Medical Holdings Corp., a national health care company that operates 113 long-term care hospitals, 16 inpatient rehabilitation facilities and more than one thousand (1000) rehabilitation clinics. Concentra provides occupational medicine, urgent care, physical therapy, and wellness services from more than 300 medical centers in 38 states.  Concentra owns thirteen (13) such clinic locations across the state of Pennsylvania.

15. UPMC further owns one hundred (100) percent of a company named Centers for Rehab Services ("CRS") which provides physical, occupational, and speech therapy services to the general patient population as well as to employees with work-related injuries or illnesses.  CRS operates over 50 centers throughout western Pennsylvania.  Since 1986, CRS has provided one of the largest networks of community-based comprehensive outpatient rehabilitation services in Western PA, and employs more than 500 rehabilitation professionals.

16. Defendant, UPMC Benefit Management Services, Inc. ("Management Services"), is a for-profit corporation organized under the laws of the Commonwealth of Pennsylvania with offices located in Allegheny County, Pennsylvania.

17. Management Services does business as UPMC WorkPartners, Inc. ("WorkPartners"), a for-profit company organized under the laws of the Commonwealth of Pennsylvania with its offices located in Allegheny County.   WorkPartners provides Third Party Administrative ("TPA") and other services to Pennsylvania employers and groups of

employers, including governmental agencies which have the financial qualifications to be self-insured for workers' compensation expenses under the Pennsylvania Workers' Compensation Act (the "Act").

18. Defendant, UPMC Health Benefits, Inc. ("Benefits" or "Health Benefits"), is a for-profit company organized under the laws of the Commonwealth of Pennsylvania with its offices located in Allegheny County.  Benefits does business as UPMC WorkPartners. Benefits sells workers' compensation insurance policies to employers in Pennsylvania.

19. Defendant MCMC, LLC, ("MCMC") is a limited liability company and the wholly-owned subsidiary of York Risk Services Group ("York") with offices in Washington County, Pennsylvania.   York is ranked as the third largest TPA in the nation. York competes with WorkPartners for the sales of third party administration services.

## IV.    FACTS:

### A.  Interstate Commerce

20. PCS does business in interstate commerce scheduling patients for treatment inside and outside of Pennsylvania with network medical service providers in Pennsylvania and neighboring states who provide medical services to employees of Pennsylvania employers.  As further explained below, PCS provides repricing of out-of-state medical provider bills for services rendered out of state for Pennsylvania workers' compensation claimants.  In addition to providing repricing services in Pennsylvania, PCS also performs repricing services for certain clients in various other states (currently 21 states) according to the workers' compensation laws and fee schedules of those states including the states with the largest volume, New Jersey, Maryland, Delaware, Ohio, and Utah.  PCS

also has numerous network contracts with medical service providers in several states, including Alabama, Georgia, Kentucky, Maryland, Mississippi, Ohio, New Jersey, New York, North Carolina, Tennessee, and West Virginia.

21. As a cost containment services provider, PCS also has a Preferred Provider Organization ("PPO") network access contract with the Coventry Health Care ("Coventry") PPO network.  Coventry is a nationwide provider of, among other things, health insurance to members of the general public.  The Coventry workers' compensation PPO network of health care providers is also the nation's largest.

22. Coventry is located in Bethesda, Maryland.

23. PCS also accesses the Prime Health Services Network ("Prime") PPO, located in Brentwood, Tennessee.  The Prime PPO has more than 700,000 medical service providers throughout the nation.

24. Through its PPO network access contracts with both Coventry and Prime, PCS is able to derive PPO discounts for its repricing clients on medical services rendered by network providers throughout Pennsylvania as well as the nation.

**B.  Explanation of the Marketplace**

25. PCS provides workers' compensation cost containment services to insured employers, self-insured employers, TPAs, and insurance companies in Pennsylvania, pursuant to and in accordance with the provisions of the Act, and in other states pursuant to the workers' compensation statutes in those states.

26. Pursuant to §531 of the Act:

Provided an employer establishes a list of at least six designated health care providers, no more than four of whom may be a coordinated care organization and no fewer than

three of whom shall be physicians, the employee shall be required to visit one of the physicians or other health care providers so designated and shall continue to visit the same or another designated physician or health care provider for a period of ninety (90) days from the date of the first visit.

27. Employers, therefore, are permitted to require for a period of 90 days that an injured employee seek medical care from a medical care provider identified on a list, or panel, of medical care providers posted at the place of employment.

28. To assist employers to comply with this provision, the services provided by PCS include:

   **A. Panel Development:** Panel development and maintenance is the process by which PCS develops functional and customized panel listings of healthcare providers to be utilized by the employees who incur work-related injuries and illnesses; PCS assists the employer to implement a panel in compliance with the Act and to understand the proper use of the panel.  The panels are posted at the employer's workplace and are comprised of healthcare providers who are geographically located near the place of employment and who provide the medical services most likely to be needed by the employees of the particular employer.   PCS updates and reissues the employer panels when provider demographics change and at the request of the employer.   PCS verifies the accuracy of panel provider information for all its clients' panels every six months and communicates any changes to their employer and insurance carrier clients. PCS also investigates and vets potential panel providers for qualifications, current licensing and quality of care.

   **B. Injury Management:** Injury management which involves providing the injured workers with assistance in scheduling appointments for medical treatment with panel providers, assuring the employer and claims adjuster receive prompt

diagnosis, treatment, and work status information, tracking physical therapy ("PT") treatment and reporting utilization information to the client, and scheduling all PT and diagnostic testing ("MRI/CT") with PCS discount network providers whenever possible to maximize the cost savings for employers and insurance carriers.

C. **Medical Bill Review:** Medical Bill Review and Repricing is the process whereby PCS receives from its clients all of the healthcare providers' bills for services rendered to their claimants.  PCS performs medical bill review which includes assuring the providers' documentation supports their billed charges, reducing the billed charges to the amounts allowed under the appropriate state's workers compensation fee schedule and disallowing charges accordingly.  PCS reprices the bill and generates Explanation of Reimbursement (EOR) forms which reflect the providers' billed charges, workers' compensation fee schedule reductions, medical bill review reductions, Preferred Provider Organization (PPO) discounts, and amounts payable to the provider.  PCS transmits the EORs to their clients and the clients remit payment to the providers and include copies of the EORs with their checks.  PCS issues repricing invoices and savings reports to their clients on a monthly basis.

D. **Physical Therapy and Diagnostic Network Access:**  PCS has entered into direct discount contracts with a large number of healthcare providers who render services in the fields of PT and MRI/CT.  Pursuant to these contracts, PCS can offer discounts below the mandated workers' compensation fee schedules to its clients for these services.  PCS retains a portion of these discounts as its compensation

for the panel development/maintenance and injury management services it provides to its clients at no charge. PCS has entered into such contracts with providers who are located in the states indicated in paragraph #6 above.

29. In August, 2010, PCS began providing certain cost containment services to WorkPartners. The services included panel development, appointment scheduling, injury management, and PT/MRI network services for employers who are insured by Benefits.

30. WorkPartners continued to develop its own panels for Benefits' insureds located in close proximity to UPMC's hospitals and physician practices.

31. Accordingly, WorkPartners was also a competitor of Plaintiff.

32. With the exception of WorkPartners' TPA clients Allegheny County, Port Authority, City of Pittsburgh, and the PA Turnpike Commission, repricing services for WorkPartners and Benefits have always been provided by MCMC. To the best of PCS' knowledge, WorkPartners and Benefits have not historically solicited bids from any vendor for repricing services.

33. When providing these services to WorkPartners and its subsidiaries, PCS was required to implement special procedures and protocols for WorkPartners. For example, WorkPartners had a special requirement that PCS schedule all WorkPartners and Benefits' claimants' appointments for PT services with the Centers for Rehab Services ("CRS") whenever geographically possible. As noted above, UPMC owns CRS.

34. In addition, PCS was required to place UPMC owned and affiliated physicians in WorkPartners' exclusive workers' compensation PPO network on all WorkPartners' and Benefits' employer client panels first and foremost. Whenever UPMC purchased a new practice, PCS was required to revise Benefits' insureds' panels accordingly.

WorkPartners also prohibited physicians from dispensing medications to the insureds' claimants. PCS was tasked with communicating this to the panel providers when scheduling appointments for their claimants.

35. WorkPartners also required PCS to send letters, at PCS' own expense, to all of the panel physicians listed on their TPA and insureds' panels to inform them that they were listed on the insureds' panels and to communicate all of their special provider panel protocols. WorkPartners also required PCS to communicate with providers who did not adhere to its protocols and remove them from its panels if they did not comply. In addition, WorkPartners required PCS to remove from all of the provider panels it generated all physician's practices owned by the Allegheny Health Network, a health care network that competes with UPMC in western Pennsylvania.

36. With regard to the repricing services PCS provides to WorkPartners' TPA clients, PCS is required to apply the WorkPartners' exclusive workers compensation PPO network discounts to UPMC's provider bills at no charge to WorkPartners. PCS also does not charge WorkPartners' TPA clients a PPO access fee for WorkPartners' PPO discounts, and WorkPartners never permitted PCS to do so. MCMC, however, is permitted to charge a PPO access fee to WorkPartners' TPA clients and to Benefits. MCMC shares a portion of this PPO access revenue with WorkPartners. Therefore, WorkPartners' mandate that their TPA clients use MCMC for repricing results in those employers having to pay higher prices, saving less costs and receiving a lesser quality of service, as evidenced in an 18-page report (the "18-page report") analyzing the results of a competitive repricing test audit conducted by WorkPartners in February, 2014, between PCS and MCMC. (See paragraphs 64 to 74, below)

37. With regard to PCS' medical bill review and repricing business, PCS charges on a per-line basis for its repricing services, a percentage of savings below the fee schedule for PPO network reductions (PPO access fee), and an hourly rate billed in 3-minute increments for medical bill review services resulting in savings below the fee schedule.  PCS charges on a flat fee basis for the repricing of hospital inpatient bills.  In the instance of employers directly insured by insurance companies, contracts for repricing are ordinarily entered into with the insurance carrier, although the insurance carrier is not required to contract with PCS for this service and may contract with another repricing entity even when PCS is providing the panel development and injury management services to the employer.  As noted above, MCMC has provided the repricing services to Benefits.

38. By the same token, while an insurance carrier may enter into a repricing contract with an entity other than PCS, the employer has the right to decide whether or not to require its employees to use a provider panel. If the employer chooses to require its employees to use a provider panel, the employer has the right to develop and post its own panel, or it has the right to hire any vendor it chooses to develop and manage its panel.  The employer is not obligated to utilize the services of any vendor the insurance carrier might prefer for panel development, maintenance, and management services.  The employer is free to select its own vendor for such services. The insurance company may not refuse or threaten to refuse to pay for insured medical expenses if the employer does not use a vendor recommended by the insurance company.

39. WorkPartners provides third party administrative ("TPA") services to self-insured employers, including but not limited to governmental entities, such cities, counties, municipalities, authorities and commissions, and companies, such as itself, with the

financial resources to qualify to self-insure for workers' compensation insurance in Pennsylvania.

40. In that regard, a TPA may provide services similar to those provided by PCS either on its own or through subcontractors.

41. There is no provision in the Act, however, which allows a TPA to require an employer or a group of employers for which it provides TPA services to use any particular vendor of the services provided by PCS.

42. Unless stipulated otherwise in a contract between the employer and TPA, the employer always has the right to choose its own vendors of the services provided by PCS.  In the case of such a stipulation, the TPA may engage the services of vendors like PCS as subcontractors.

**C.  Relevant Markets**

43. There are two relevant product markets in this matter.  The first relevant product market includes both insured employers who purchase workers' compensation policies and derivatively cost containment services sold by firms such as Health Benefits and WorkPartners and PCS and self-insured employers who purchase third party administration (workers compensation) services from WorkPartners and cost-containment services that are purchased in conjunction with the administration of workers compensation claims.

44. The second relevant product market is the market for medical services consumed by individuals receiving workers' compensation benefits.  This provider market is defined by the types of medical services routinely purchased by workers compensation claimants.  Fundamentally, UPMC's conduct is motivated to reduce substitution away

from UPMC's dominant providers by workers' compensation carriers who would contract with firms such as PCS for cost containment services.  Specifically, as referenced in paragraphs 28 and 47, PCS is known for its ability to assemble provider panels that use facilities or medical providers which are less costly than UPMC.  Employers "like" PCS because they save money when utilizing PCS's-assembled, more cost-effective provider panels.  To the extent that because of UPMC"s conduct workers compensation policies sold to these same employers are less competitive on a price or non-price basis, the likelihood is higher they will switch to a policy sold by Health Benefits or WorkersPartners.  Additionally, the likelihood is greater that the workers' compensation claimants employed by these same employers will ultimately utilize a UPMC provider in lieu of a non-UPMC provider.  As such, UPMC's conduct with respect to PCS is properly construed as an attempt to reduce substitution away from UPMC's more expensive and dominant provider facilities.  Such behavior preserves or increases UPMC's monopoly power in the defined relevant provider market.

45. The relevant geographic markets associated with each relevant product market are the same geography and are no larger than Western Pennsylvania.  Employers with places of business in this area and who seek workers' compensation insurance would also demand cost containment services that gives their employees who claim workers compensation benefits convenient access to medical providers located in this geography.  Similarly, their employees who are workers compensation claimants and need medical services will naturally frequent medical providers convenient to their place of work or residence.

46. In this geography, UPMC-owned or affiliated facilities and providers possess significant market or monopoly power generally in the provision of health care services in this

geography as well as specifically to workers compensation claimants requiring medical services.  UPMC-owned or affiliated providers control at least seventy (70) percent of the health care services consumed as set forth above in paragraph 7.

**D.  <u>Harm to Competition</u>**

47. PCS and competition have been harmed in the relevant markets for workers compensation benefits and the sale of cost containment services sold to those employers. Specifically, UPMC's conduct with respect to PCS has made it more difficult for PCS to sell cost containment services to employers who purchase workers compensation benefits from firms other than Health Benefits and WorkPartners.   PCS is known as the "industry leading" firm that sells cost containment services to employers located in the relevant geographic market. Indeed the 18-page study performed by WorkPartners itself showed that PCS, when compared head-to-head with MCMC, demonstrated greater cost savings. The harm which is incurred by PCS reduces the abilities to compete of carriers who sell policies in competition with Health Benefits and WorkPartners.   UPMC's conduct, therefore, is an effort to remove the low-cost cost containment services provider in the relevant market. The effect of that is to artificially increase Health Benefits and WorkPartners share of workers compensation policies and associated cost containment services.  Upon information and belief, because of UPMC's dominance as a medical provider, Health Benefits and WorkPartners would be expected to enjoy a significant share of the workers compensation policies or cost containment services sold to employers located in the relevant geography, and the aforementioned practices serve to artificially further increase their share to the disadvantage of other carriers and PCS which sells cost containment services to those companies.

48. While PCS is not a direct competitor in the provider market alleged, the ultimate purpose of UPMC's conduct vis-à-vis PCS is to preserve or increase its dominance in the relevant provider market, which damages provider competition for both patients who are the recipients of workers compensation benefits and more generally all patients.

49. Barriers to entry exist in the relevant cost containment services market because of the considerable expertise that is required to sell such services to employers.  PCS knows of no other independent firms selling comparable comprehensive cost containment services to employers in the relevant market. On information and belief, because of its stature and success earned prior to UPMC's conduct, its share of such cost containment services is significant.

**E.   Interstate Commerce**

50. Defendants' activities, including their concerted actions, are in the flow of, and substantially affect interstate commerce.  Because many employers are located out of Pennsylvania but have employees who work in Pennsylvania, they must purchase workers' compensation with Pennsylvania coverage. Accordingly, Defendants communicate with customers over state lines using telecommunication networks, the Internet and U.S. mail.

**F.   Antitrust Standing**

51. The injuries to the Plaintiff described herein, which are caused by the Defendants' illegal antitrust activities are the types of injury that the antitrust laws were intended to provide redress.  They are direct injuries, not speculative, and there is no potential for duplicative recovery.

**G.  Relationship Among the Parties**

52. In 2006, PCS entered into a Medical Bill Review and Repricing Agreement ("Agreement") with WorkPartners.  The Agreement is attached hereto as **Exhibit 1**.

53. The Agreement provided in general that PCS would "review and reprice medical bills submitted by UPMC WorkPartners in accordance with the [Pennsylvania Workers' Compensation] Act."

54. The paragraph headed "MISCELLANEOUS" provides:

Each party agrees to hold in confidence any information obtained by it relating to the business of the other and agrees to instruct its agents, employees, representatives, and independent contractors to keep all such information strictly confidential. Each party agrees that it will not directly or indirectly disclose, communicate, divulge, furnish to or use for the benefit of itself, or any other person, firm or corporation, any of the trade secrets, designs, improvements, inventions, data, information, or know-how, belonging to the other which may be communicated to it or which it may learn by virtue of its activities under this Agreement.

55. In 2010, Benefits was approved as a workers' compensation insurance carrier in the state of PA and began to sell workers' compensation insurance to Pennsylvania employers. This activity is UPMC's commercial insurance program and the insurance is sold under the name UPMC Health Benefits.  Benefits contracts with various insurance brokers who sell Benefits workers' compensation insurance on a commission basis.

56. Subsequently, the business of providing TPA services and providing commercial insurance was divided between WorkPartners and Benefits so that UPMC Health Benefits was recognized as the name of UPMC's workers' compensation insurance carrier.

57. Said insurance policies were and are sold through insurance brokers many of whom sell workers' compensation policies on behalf of other insurance companies, some of which utilize PCS' services.  Due to PCS' reputation for quality service and their proven effective

workers' cost containment services, therefore, PCS has developed excellent relationships with several of these brokers.

58. As a result of these relationships and the equally excellent reputation which PCS has in the Pennsylvania workers' compensation community among employers, insurance carriers and brokers, the brokers often recommended that their insured employer clients use the cost containment services of PCS.

59. As of the May 1, 2015, PCS was providing such services to more than 1000 of those employers who are insured directly by Benefits.

60. In July, 2012, WorkPartners and Benefits made the decision to utilize the PCS physical therapy ("PT") and diagnostic ("MRS/CT") network for the majority of their other employer clients and insureds. Accordingly, they required PCS to provide its then current listing of PT and MRI/CT network providers to them and update the listing when necessary.

61. Additionally, WorkPartners and Benefits required PCS to send letters to all of its PT and MRI network providers informing them that Benefits utilizes the PCS network and to remit all of their bills for Benefits' claimants directly to PCS as opposed to WorkPartners and Benefits, whether PCS scheduled the PT or MRI/CT services with said provider or not. This enabled WorkPartners TPA clients and Benefits to take advantage of the discounts available through the use of PCS' network not only on a prospective scheduling basis, but a retrospective basis for those providers who allowed retrospective discounting of their bills. Benefits was made aware that PCS' contracts with its network providers only allowed for prospective scheduling of referrals, but WorkPartners and Benefits made this demand of PCS regardless of this fact.

62. On February 20, 2014, WorkPartners requested that PCS provide to it the full electronic data base of the panel physicians PCS utilized on all Benefits insureds' provider panel listings.  (See **Exhibit 2** hereto).

63. PCS complied with this request.

64. In February, 2014, WorkPartners sought to have PCS perform an extensive medical bill review and repricing test audit at no charge to WorkPartners purportedly to determine whether PCS or Benefits' current repricing vendor, MCMC (PCS' competitor), provided the best service and the most savings.  WorkPartners requested that PCS do this audit in a rush manner.

65. The audit also included a review of all of the services which PCS provided.

66. PCS was advised that if the audit proved PCS to be the superior vendor, WorkPartners would award its repricing business to PCS.

67. Following the submission by PCS of the results of its repricing audit of the bills, WorkPartners sent to PCS several email inquiries and made several phone inquiries of PCS regarding certain aspects of the repricing audit results including, but not limited to, requesting, for example, detailed explanations and supporting documentation from PCS to ascertain why PCS denied payment for certain medical services for which MCMC had allowed payment.

68. Linda Schmac, PCS' President, expressed her reservations to Deb Mehalik, an employee of WorkPartners, about providing responses to the inquiries of WorkPartners as she was very concerned this information was being transmitted by WorkPartners to MCMC to enable MCMC to improve its bill review performance.  Ms. Schmac reminded Ms. Mehalik that when WorkPartners recognized a year or so earlier that PCS was deriving better

savings for its self-insured clients through PCS' access to the Coventry PPO network discounts as compared to the savings WorkPartners was deriving through MCMC's use of a different network, WorkPartners simply forced MCMC to switch to Coventry as opposed to awarding PCS its repricing business.  Schmac also reminded Mehalik that when the Port Authority, one of WorkPartners Managed Care clients, conducted a comparison of repricing vendors many years before and PCS was found to be far superior than all vendors including the incumbent MCMC, WorkPartners requested that the Port Authority, Janet Wyvratt and her manager, meet with MCMC to review aspects of the audit where PCS had performed better than MCMC.  Although WorkPartners attempted to persuade the Port Authority to allow MCMC to correct their deficiencies to retain the Port Authority's repricing business, Wyvratt, with management's approval, made the fair and equitable decision to utilize PCS despite WorkPartners' attempts to convince her otherwise.

69. Ms. Schmac was assured by Ms. Mehalik, however, that PCS had a great shot to get Benefits repricing business if it did well on the repricing test audit.  Ms. Mehalik indicated that WorkPartners had formed an evaluation committee to review and analyze the results of the repricing test audit, and the committee was tasked with issuing a report with its findings and recommendations to senior WorkPartners management personnel.

70. In a subsequent conversation, Ms. Schmac was advised by Ms. Mehalik that PCS had performed in a superior manner to MCMC on virtually every measure of competence and that an 18-page business case study report had been issued to WorkPartners senior management recommending that PCS be awarded the repricing and medical bill review business for Benefits.

71. In fact, the 18-page report confirms that on every criterion, including cost savings, evaluated by the committee, PCS' repricing services were superior.

72. In addition, the committee compared the panel development services provided by PCS to Health Benefits' insured employers and WorkPartners' self-insured employers to the ability of another vendor, Align Networks, to provide the same services and recommended that PCS be retained as the vendor of those services.

73. Align Networks ("Align") is a wholly-owned subsidiary of One Call Care Management, Inc., ("One Call") and is located in Jacksonville, FL.   Align has offices in Washington County, Pennsylvania.  Align operates one of the largest workers' compensation provider networks of outpatient rehabilitation facilities in the nation.

74. Accordingly, in the head-to-head competition between PCS and MCMC for repricing and between PCS and Align for panel development services, **PCS won on all counts**.

75. On May 23, 2014, one Jason Gallagher, an employee of WorkPartners, requested that the PCS panel provider data base of information be updated and provided in the form of an Excel spreadsheet.  He claimed that he was working on a panel treatment compliance project to evaluate Benefits' insureds' injured workers. (See **Exhibit 3** hereto)

76. PCS provided the requested Excel spreadsheet.

77. On June 3, 2014, Gallagher requested that PCS provide to him the tax ID and phone numbers for each of the providers in the spreadsheet.

78. PCS again provided the requested information.

79. On September 15, 2014, Ms. Schmac noticed that PCS had not received any employer panel referrals from Benefits since August 27, 2014.   Since Benefits consistently

submitted panel requests to PCS on a weekly basis, she wondered why UPMC had not done so since late August.

80. Accordingly, she directed Donna Burkhart, PCS Client Services Manager, to send an email to Steve Wagner, Benefits' Claims Manager, to inquire regarding the reason for the decline.

81. Wagner responded "No, everything is okay. A little slower time right now."(See **Exhibit 4** attached hereto)

82. On October 10, 2014, another employee of WorkPartners, Erica Brosk, requested even further information from the PCS panel provider database, including a "unique identifier" for each employer, each panel, and each provider.  Her excuse for this request was "to be able to receive a full replacement file of this data on an ongoing basis." The "unique identifiers" were, she wrote, the key to this process. (See **Exhibit 5** hereto)

83. PCS again complied, providing a spreadsheet containing the unique PCS keys from its database for the employers, the panels and the providers for the panels which PCS developed and managed for WorkPartners and Benefits.

84. The data provided to WorkPartners covered 1500 pages and 47,000 records of electronic attachments to the emails which PCS sent to WorkPartners in response to their requests.

85. The data provided to WorkPartners constitutes a compilation of the total medical provider information generated, maintained, and updated over many years and at substantial expense of money and time to PCS.  The data is thus PCS' proprietary and trade secret information.  It could not be duplicated by WorkPartners without the expenditure of hundreds of thousands of dollars and a great deal of time.

86. Further, the data base constituted the valuable personal property belonging to PCS at the time that WorkPartners induced PCS to provide a complete copy of the data comprising PCS' property.

87. On November 13, 2014, however, at a meeting with PCS executive and senior management personnel, and only after it had received all of the electronic medical provider data that it had requested, WorkPartners advised PCS that MCMC and not PCS would receive the Benefits repricing contract.  At this same meeting, Jim Cottone, Senior Director Absence Management, advised Ms. Schmac and PCS' management that Benefits had also made the decision to start using Align and not PCS for all of its insureds' new panel development, PT and MRI/CT services.   Despite Ms. Schmac's repeated requests as to the reason for WorkPartners decision, Mr. Cottone refused to provide one, but indicated he could not deny it was "relationship based." Mr. Cottone also refused to provide PCS with the results of the repricing audit.  Mr. Cottone indicated he was unaware that Steve Wagner had issued an email to PCS indicating "No, everything was okay, we're just slow" the previous month while at the same time WorkPartners requested PCS panel database.   Ms. Schmac forwarded Wagner's email to Cottone and Mehalik after the meeting to prove this point, but neither responded to Ms. Schmac's email regarding the reason for the deception.

88. Ms. Schmac reminded Cottone that PCS was currently managing over 1000 panels for Benefits' insureds and it is an employer's right to continue utilizing PCS if it chose to do so.   Cottone advised Ms. Schmac that WorkPartners had not yet made a decision regarding the existing panels PCS managed for Benefits' insureds, but indicated he would

get back to her regarding this as if Benefits could, by law, make this decision for Benefits' insureds.

89. PCS believes and therefore avers that at no time did WorkPartners intend to contract with PCS for the medical bill review and repricing work for Benefits.  Instead, in breach of the 2006 Agreement and as a consequence of its fraudulent misrepresentations, WorkPartners used the information from the PCS repricing test audit and the subsequent information it obtained from PCS for its own benefit and to transmit PCS' extensive know-how in bill review and repricing to MCMC to improve MCMC's bill review and repricing competence in order to justify the decision not to use PCS and continue to use MCMC.

90. Benefits' employee Wagner's statement in September that things were just slow, therefore, was completely false because PCS has never received another panel referral from Benefits since August 2014.   Unbeknownst to PCS, at the same time that WorkPartners was requesting that PCS provide it with multiple extractions from its trade secret panel provider data base, Benefits had been using this information to develop panels in-house and/or referred its requests for panel development from at least August 2014 to either MCMC and/or Align, a PT network competitor of PCS, and further, a network that is contracted with MCMC.  MCMC and Align have never performed the type of comprehensive panel development and management services provided by PCS to its clients.  MCMC has operated primarily as a repricing vendor and Align has operated primarily as a national discounted PT network vendor.  Historically, MCMC and Align simply accessed PPO directories to develop provider panels for its clients.  MCMC and Align did not contact the insureds to obtain input on their panels, verify provider information, nor review client protocols prior to the placement of providers on the panel.

Despite the representation of Mehalik that PCS had completely outperformed MCMC on the February, 2014, audit, WorkPartners elected to use the services of inferior and less cost-effective vendors for its repricing and panel development for Benefits' insured employers.

91. Historically, MCMC and Align did not place a toll free number on the panels they develop for the purpose of providing the claimant with assistance in scheduling all panel provider appointments.  Nor does MCMC and Align obtain work status information from the panel physicians and provide it to the employers, insurance carriers, and TPAs after each and every visit.  MCMC and Align are not companies which have ever specialized in panel development and injury management services.

92. On November 13, 2014, WorkPartners advised PCS that Align had been doing panel development for Benefits since August 27, 2014, the date since which, Ms. Schmac noticed that no panel referrals had been received by PCS for Benefits' insureds.  PCS believes WorkPartners may have falsely communicated to PCS that Align had been doing panel development since August 27, 2014, when in fact WorkPartners was using PCS' proprietary and trade secret panel data base to provide this service in-house and also to assist Align in providing a similar quality panel development service as PCS provided to Benefits' insureds.  WorkPartners' counsel subsequently issued a letter to the Port Authority on May 20, 2015, indicating that MCMC, and not Align, was providing panel generation services for WorkPartners.

93. Despite the fact that WorkPartners had decided to give the repricing work to MCMC and further indicated it was utilizing Align for panel development, on February 17, 2015, Cottone sent to PCS a proposed Master Services Agreement ("MSA"), which he

communicated to Ms. Schmac was "imperative be signed and executed by March 1, 2015." Mr. Cottone also indicated "We (WorkPartners) intend to use this template agreement with all medical bill repricing and panel generation vendors moving forward."

94. A reading of the MSA, however, proved it to be so oppressively restrictive, particularly in regard to its "Deliverables" provision, Section I.B., that it would have effectively required PCS to  give to WorkPartners all of its trade secret electronic data.  Accordingly, PCS rejected the opportunity to sign it.  The proposed contract is attached hereto as **Exhibit 6**.

95. Any suggestion or representation by WorkPartners that the reason it failed or refused to have a business relationship because of the refusal by PCS, however, is false because WorkPartners has not required or even asked any other vendor, including MCMC,  Align or One Call to sign and execute the same or similar MSA.

96. Mr. Cottone falsely communicated to Ms. Schmac that WorkPartners intended to do so.

97. In fact, neither MCMC, Align nor One Call has signed the MSA.

98. Currently, Align provides its panel development services to WorkPartners self-insured employers and Health Benefits insured employers without a written agreement of any kind.  Yet, WorkPartners and Health Benefits personnel continue to convey to their insureds that the reason they cannot use a PCS managed panel is because PCS is not contracted with WorkPartners and, therefore, the PCS panel is not considered an approved panel by WorkPartners.  WorkPartners personnel conveniently fail to disclose to its insureds that Align is also not contracted with WorkPartners to perform any services whatsoever.

99. MCMC provides its repricing services to Health Benefits and WorkPartners' self-insured employers under the provisions of a 2009 contract which requires MCMC to pay to WorkPartners a percentage of the access fee which MCMC charges Health Benefits and the self-insured employers for access to the UPMC exclusive preferred provider network. WorkPartners and Health Benefits have purposely not disclosed this revenue sharing arrangement with MCMC to its employer clients as they are well aware that this kick-back arrangement increases the medical costs incurred by WorkPartners' employer clients.   To the contrary, when WorkPartners utilized PCS as the repricing vendor for its self-insured employer clients, PCS had no such revenue sharing arrangement with WorkPartners, and therefore, these employers realized a decrease in medical costs.   Had Health Benefits selected PCS as its' repricing vendor as recommended by its own internal 18-page case study report, its insureds would also have realized a decrease in medical costs.   In other words, even though it would have been in WorkPartners' and Health Benefits' insureds' best financial interest for WorkPartners to utilize PCS for repricing on behalf of their clients, WorkPartners made the decision to utilize MCMC, the repricing vendor it found to be less cost effective for its own selfish financial gain as WorkPartners knew it would have lost the PPO access revenue MCMC kicked back to them if they chose PCS.

100. WorkPartners was well aware that PCS and WorkPartners current repricing vendor, MCMC, could not sign an agreement with WorkPartners which required either of them to access WorkPartners exclusive PPO network discounts in a primary position.   PCS and MCMC are prohibited from doing so in accordance with their respective PPO network access contracts with Coventry.   PCS believes and therefore avers, however, that MCMC

purposely breached its contract with Coventry and applied WorkPartners' exclusive PPO network discounts in a primary position for the sole financial benefit to WorkPartners and MCMC.  PCS avers, therefore, that WorkPartners breached its fiduciary duty to its insureds.

101. PCS believes and therefore avers that WorkPartners never intended to use the services of PCS under the MSA but attempted to induce PCS to sign the MSA so that WorkPartners would not have to return the provider panel data base information to PCS or reveal that WorkPartners had used PCS' trade secret provider panel data base improperly.

102. In other words, WorkPartners, MCMC, and/or Align had been doing panel development during the time that WorkPartners was requesting that PCS provide its unique trade secret and confidential electronic provider panel data to WorkPartners.

103. On February 27, 2015, Ms. Schmac sent an email to Cottone of WorkPartners requesting that the electronic data be returned and that a certification be provided by a WorkPartners agent that none of the data had been provided to Align or used for any purpose. (**Exhibit 7** hereto)

104. WorkPartners never responded to this email. The electronic data, moreover, has never been returned and no certification was received.

105. As a result of the termination of the relationship between PCS and WorkPartners, WorkPartners and PCS have in fact become competitors.

106. WorkPartners competes with PCS for the ability to provide panel development, injury management and discounted PT and MRI services to the employees of Health Benefits' insured employers by representing to said employers that the amount of their premiums will increase if they do not use panels approved by WorkPartners and/or Health Benefits.

107. WorkPartners competes with PCS' PT network services by directing that Health Benefits' insured employers use the physical therapy services of CRS.   WorkPartners competes with PCS' MRI network services by directing that Health Benefits' insured employers to use the MRI services of UPMC's own diagnostic testing facilities.  WorkPartners competes with PCS' PT and MRI networks by mandating that Health Benefits' insureds utilize "WorkPartners approved panels" which include either UPMC-owned PT and MRI network facilities or include the Align PT and One Call diagnostic networks or a combination of both.

108. Moreover, the written and/or oral agreements or understandings among the Defendants have seriously affected the prices for and quality of the services delivered to the self-insured clients of WorkPartners and the employers who are insured by Health Benefits.

109. Further, as UPMC has monopoly power in the health care industry, including that segment of the industry which provides medical services to employees injured during the course of their employment within the relevant geographical market area, the conduct of the Defendants effectively shuts Plaintiff out of that market.

110. As Defendants control the provision of cost containment services to their insured and self-insured employer clients and as Defendants do not apprise their employer clients of the financial arrangements among themselves or of the audit results demonstrating the ability of Plaintiff to provide higher quality and more cost effective services, the usual market forces which might penalize the provision of inferior services at higher cost do not operate.

111. In fact, WorkPartners' president, Dave Weir at a December 12, 2014, meeting with Jim Cottone and Ms. Schmac and Tom Mannering of PCS stated "Make no mistake about it... It

is my intent to eliminate all third party vendors and provide these services on our own."

At this same meeting, Mr. Weir also complimented Ms. Schmac on having a great business

model and indicated a desire to purchase PCS.  Ms. Schmac informed Mr. Weir that she

had no immediate desire to sell PCS and further, would not consider selling to UPMC.  Mr.

Weir indicated that everyone has a price, and asked Ms. Schmac what it would cost and

further quoted a figure of $8 Million.  PCS believes and therefore avers that Weir, acting

on behalf of WorkPartners, attempted to coerce Ms. Schmac into selling PCS to

WorkPartners and when he did not succeed, he set in motion a plan to eliminate PCS from

the relevant geographical market.

112. On March 26, 2015, Weir sent a letter to Ms. Schmac purporting to terminate the 2006

Medical Bill Review and Repricing Agreement effective April 30, 2015.  Weir cited no

reason for the contract termination in his letter to Schmac. See **Exhibit 8** hereto.

113. Shortly after Weir's letter, Patrick Haughey of WorkPartners sent an email to a number

of insurance agencies advising them that WorkPartners had terminated the Agreement.

See **Exhibit 9** hereto.

114. The email falsely implied that the termination of the Agreement meant that PCS would

no longer be providing "certain medical bill re-pricing and panel generation services" to

the workers' compensation insurance clients of the agencies.

115. The implication was false insofar as it was and is not necessary for PCS to contract with

WorkPartners in order to be able to provide panel development and injury management

services to any employer in Pennsylvania including employers insured by Benefits.

116. Further, this email falsely indicated:

> UPMC WorkPartners ("WorkPartners") historically has contracted with Premier
> Comp Solutions ("PCS") to provide certain medical bill re-pricing and panel

generation services.  Please be advised that, effective as of April 30, 2015, the contract between WorkPartners and PCS will terminate . . . .

117. This statement was false since the 2006 Agreement WorkPartners purported to terminate did not include any reference whatsoever to panel generation services. WorkPartners' email was disparaging in that it indicated "If you receive information from PCS that you believe to be inconsistent with this letter, please contact…"  This statement is disparaging in that it implies that WorkPartners believes PCS would provide information to the agencies that was not truthful, was not credible, and was without merit and integrity.  In other words, PCS information is not to be trusted.

118. WorkPartners failed to specify in its termination letter to PCS which medical bill review and repricing business was being terminated by WorkPartners as PCS had entered into separate contracts and subcontracts with four governmental agencies identified below and these contracts were not affected by the termination of the 2006 Agreement.   Since PCS does not otherwise perform repricing services for WorkPartners or Benefits, the termination letter had no purpose or impact other than to communicate false information to the workers' compensation insurance community in an effort to lessen PCS's credibility and reputation for competence in the opinion of those who received the letter.

119. The employer has the right to select a vendor for such services and WorkPartners has no right to prevent an employer from engaging PCS to provide panel development, injury management, and PT or MRI/CT network services.

120. The termination of the Agreement, in other words, had no effect on the ability of PCS to continue after the purported April 30, 2015, termination date to provide its services to any employer or group of self-insured employers except insofar as it discouraged

insurance brokers with whom PCS had  prior relationships from recommending PCS' services to their insurance clients.

121. Upon receipt of the letter of termination, on March 31, 2015, counsel for PCS wrote to WorkPartners and again demanded the immediate return of the electronic data and the certification that the electronic data had not been provided to any other party.  Further, PCS counsel demanded that WorkPartners issue a written communication retracting the false information it conveyed to the insurance agency community.  As of the filing of this Complaint, however, the electronic data had not been returned to PCS and no certification had been issued by WorkPartners.  Further, PCS has not yet received a copy of the retraction letter it demanded that WorkPartners issue to the insurance agents.

122. As a result of the filing of a lawsuit, however, an Allegheny County Court judge ordered Defendants to return the data base, directed Defendants to cease using the data in the data base and to account to PCS for the identities of the persons to whom the data base had been transmitted after it was transferred to WorkPartners. (**Exhibit 10** hereto)

123. To date, the data base has not been returned although counsel for UPMC has represented that the data base is no longer being used and has provided the names of UPMC and WorkPartners personnel who received copies of the data base.

124. PCS believes, however, and therefore avers that WorkPartners continues to use the information in the data base to generate provider panels for employers for whom PCS previously performed the panel generation and injury management services.

125. PCS believes and therefore avers that WorkPartners' purpose in obtaining PCS' provider panel data base of trade secret and confidential information was so that the information contained therein could be used by WorkPartners and/or provided to MCMC or Align so

that either of these companies could more easily develop and maintain the employer panels that had been developed by PCS and to access the physician panel providers which PCS not only utilized for Benefits insureds' panels but for all other PCS clients. WorkPartners, therefore, continues to take advantage of the substantial amount of work and money which PCS expended in creating and updating the data base, investigating and vetting the qualifications of the providers on the data base, reviewing and verifying WorkPartners' special client protocol requirements and communicating by letter to those providers on the data base those special client protocol requirements.

126. PCS believes and therefore avers that the confidential and trade secret information contained in the spreadsheet provided by PCS to WorkPartners has been used by WorkPartners or provided to MCMC and/or Align to allow either of these companies to perform the specialized panel development services for the benefit of Benefits' insured employers and WorkPartners' self-insured employer clients.

127. During the period of time that PCS was providing panel development services for WorkPartners, WorkPartners required that PCS place Concentra clinic locations on all panels developed for WorkPartners and Benefits across the state whenever possible.

128. As a result, PCS generated for Benefits' insured employers one hundred seventy (170) panels on which Concentra was listed as a provider.  PCS also listed Concentra as a provider on four (4) panels for WorkPartners.  PCS listed Concentra as a provider on approximately 2000 panels for other insureds across the Commonwealth of Pennsylvania.

129. On or about May 12, 2015, however, PCS was advised that Concentra had been instructed by WorkPartners not to cooperate with PCS by providing to PCS documents needed by

PCS to perform its services to employers insured by Benefits.  Concentra has historically always provided this information to PCS.

130. As part of its standard injury management services to such employers, PCS is required to obtain documents referred to as patient work status forms from all panel providers.  The forms contain information on whether and when an injured employee will be able to return to work along with their physical capacities. The form also contains information regarding what injured workers need for additional medical services such as specialist evaluations, PT, and diagnostic testing so that PCS can not only schedule these appointments in a timely manner for the injured workers, but so that PCS can provide the injury management and PT and MRI/CI network services it has promised to its employer and insurance carrier clients.

131. Since Concentra refuses to cooperate with PCS by providing work status forms for employees who work for employers insured by Benefits, PCS cannot list Concentra as a provider on any employer panels for Benefits and cannot, therefore, continue to provide injury management services to any Benefits insured who chooses to have Concentra on its panels.

132. Further, WorkPartners is and has been advising the Benefits-insured employers that they may not use PCS as a vendor for panel development or injury management services or for PT or MRI network discount services.

133. WorkPartners has begun virtually on a daily basis to re-direct injured employees in need of rehabilitation services to CRS, its wholly-owned physical rehabilitation services provider or Align and away from PCS' PT network providers even in circumstances in which PCS has been performing the injury management of the employees' treatment and

has made the appointment for the employee pursuant to the prior arrangement with the employer.

134. WorkPartners has also redirected injured employees in need of diagnostic services to One Call Medical, a PCS' diagnostic network competitor, and away from PCS' diagnostic network even in circumstances in which PCS has been performing the injury management of the employees' treatment.

135. UPMC claims that it maintains a Supplier Diversity program pursuant to which it encourages Disadvantaged Business Enterprises ("DBEs") to seek participation in public or private contracts with governmental agencies or private companies that have DBE participation percentage requirements.

136. PCS has been registered as a DBE with UPMC's Supplier Diversity program for many years.

137. Representatives of PCS have participated in diversity programs sponsored by UPMC in which UPMC claims to promote such DBE participation not just with UPMC but within the corporate community.

138. Although WorkPartners required PCS to register as a DBE with UPMC's Supplier Diversity Program, based on WorkPartners' conduct outlined this complaint, WorkPartners has not complied with any aspect of UPMC's Supplier Diversity Program initiatives and policies.  PCS believes and therefore avers that UPMC is misrepresenting its "commitment to supplier diversity as an integral part of its overall Supply Chain Management strategy" to the community.  Further, UPMC is misrepresenting that "It is the policy of the UPMC Supplier Diversity Program to ensure that certified DBEs are

provided the maximum opportunity to participate as partners and suppliers of goods and services."

139. PCS has provided, as set forth in more detail below, repricing, medical bill review, panel development and injury management services to four governmental agencies: Allegheny County, City of Pittsburgh, Port Authority of Allegheny County and Pennsylvania Turnpike Commission, each of which is self-insured for workers' compensation.

140. WorkPartners has been the TPA for Allegheny County and the City of Pittsburgh for many years.

141. WorkPartners has for several years provided managed care services under a contract with Port Authority of Allegheny County. In February, 2015, the Port Authority Board issued a resolution indicating their intent to renew its Managed Care Program Agreement with WorkPartners.   PCS believes that Port Authority has not yet executed the agreement.

142. On January 1, 2005, PCS was identified as a DBE subcontractor for WorkPartners for repricing and for PT and MRI/CT services for the WorkPartners' TPA contract with City of Pittsburgh.  PCS was identified again as a DBE subcontractor for the City's TPA contract in 2010 and again on January 1, 2014.

143. PCS' inclusion in the 2014 City contract was based upon a Letter of Intent submitted by PCS (erroneously identified as "Premier Medical Consultants") and signed by PCS' Executive Vice President, Don Schmac. (Attached hereto as **Exhibit 11**)

144. The inclusion of PCS was contingent upon WorkPartners being awarded the contract with the City and included a commitment to PCS for approximately 6.4% of the total

estimated program cost as the time of the submittal, or approximately $280,000 over a four year period.

145. Thereafter, PCS mobilized to provide the services required and expended a large amount of time and money to complete the Subcontractor Responses and other information requests from the City. (Attached hereto as **Exhibit 11**)

146. On January 1, 2006, PCS was added as a DBE subcontractor by WorkPartners for a Managed Care Program contract WorkPartners had with Port Authority of Allegheny County.  A new contract as a DBE subcontractor was entered into between WorkPartners and PCS on February 1, 2015.

147. Prior to WorkPartners using PCS as a subcontractor for its Managed Care Program contract Port Authority had a direct relationship with PCS.  PCS provided Port Authority with the same exact services for several years prior to January 1, 2006.

148. In fact, the Port Authority performed a repricing audit and determined that the PCS repricing performance on that audit was far superior to the other repricing vendors including MCMC, who WorkPartners previously utilized to reprice Port Authority bills. Through a Right-to-Know request, PCS received documentation from Port Authority indicating that WorkPartners made the decision to utilize MCMC to reprice Port Authority medical service provider bills after April 30, 2015 despite the fact that audits performed by both WorkPartners and Port Authority determined PCS' repricing services and costs savings to be superior to those of MCMC.

149. Despite the fact that PCS had a direct relationship with Port Authority, Port Authority requested that PCS permit WorkPartners to use PCS as a subcontractor on the Managed

Care Program contract because WorkPartners was failing to meet the established percentage of DBE participation requirement in the contract.

150. WorkPartners was failing to meet the DBE participation requirement despite the fact that it claims to maintain a strong DBE program which encourages minority and women entrepreneurs to become involved in the workers' compensation cost-containment industry.

151. PCS again signed a letter of intent which was contingent upon the award of a contract to WorkPartners. (See **Exhibit 12** attached hereto)

152. The commitment to PCS was approximately $163,000 or 5% of the total estimated contract cost at the time of the submittal over a period of 5 years.

153. Again, PCS expended a tremendous amount of time and money to mobilize to provide the services required and to support the effort of WorkPartners to secure the contract.

154. On January 30, 2015, Port Authority of Allegheny County Board passed a resolution authorizing agents of the Authority to enter into a 5-year Managed Care Contract with two one-year extensions.  The Resolution, attached hereto as **Exhibit 13**, was based in part upon the conclusion of the Board that WorkPartners had presented a cohesive and relevant team of resources to perform the services and utilizing subcontractors, one of whom was PCS. The other two subcontractors, Concentra and Centers for Rehab Services, are owned in whole or in part by UPMC.

155. PCS is identified in the Resolution as a certified PAUCP DBE.

156. In April, 2012, PCS entered into a 3-year contract directly with Allegheny County to provide repricing services as well as PT and MRI/CT network services.  (**Exhibit 14** hereto). The contract has been extended to July 31, 2016. (**Exhibit 15** hereto)

157. PCS believes and therefore avers that at the termination of the PCS contract with the County, WorkPartners will attempt to displace PCS as the provider of repricing and PT and MRI/CT network services vendor to the County.

158. On April 1, 2014, WorkPartners became a TPA for the Pennsylvania Turnpike Commission.

159. On April 1, 2014, PCS was identified as a DBE subcontractor for repricing, panel development, injury management, PT and MRI/CT network access for the WorkPartners TPA contract with the Pennsylvania Turnpike Commission.

160. The DBE subcontractor agreement with the Turnpike Commission was again based upon a letter of intent signed by PCS. (Attached hereto as **Exhibit 16**) and was contingent upon WorkPartners receiving a contract with the Turnpike Commission.

161. The commitment to PCS was approximately $93,000 or 11.5% of the total estimated cost at the time of the submittal over three years.

162. PCS, as evidenced by **Exhibit 16**, engaged in a tremendous amount of work and spent a lot of money to mobilize to provide the services which would be required during the following three years with the Turnpike Commission and to support WorkPartners in its effort to secure the contract.

163. WorkPartners relied upon the certification of PCS as a DBE entity to obtain the contracts with each of the Governmental Agencies.

164. All four of the Governmental Agencies identified above require their contractors to abide by DBE, MBE and WBE participation programs.

165. Port Authority is the DBE certifying agency for PCS.

166. In administering those programs, the Governmental Agencies follow the guidelines of the US Department of Transportation as set forth in 49 CFR 26.53.

167. Pursuant to regulations governing DBE subcontractor/prime contractor relations in Pennsylvania, prime contractors such as WorkPartners must request approval in writing from the public agency to terminate the contract with a DBE firm.

168. Prior to the request for approval, the prime contractor must notify the DBE in writing of its intent to terminate the subcontract and include a statement of the reasons why.

169. The DBE firm must be given five (5) days from the receipt of notice in order to respond and set forth the reasons why it objects to the termination.

170. The DBE subcontractor's contract may only be terminated for good cause. Good cause under 49 CFR 25.53 (f)(1) includes:

(i)     The listed DBE subcontractor fails or refuses to execute a written contract;

(ii)    The listed DBE subcontractor fails or refuses to perform the work of its subcontract in a way consistent with normal industry standards. Provided, however, that good cause does not exist if the failure or refusal of the DBE subcontractor to perform its work on the subcontract results from the bad faith or discriminatory action of the prime contractor;

(iii)   The listed DBE subcontractor fails or refuses to meet the prime contractor's reasonable, nondiscriminatory bond requirements.

(iv)    The listed DBE subcontractor becomes bankrupt, insolvent, or exhibits credit unworthiness;

(v)     The listed DBE subcontractor is ineligible to work on public works projects because of suspension and debarment proceedings pursuant 2 CFR Parts 180, 215 and 1,200 or applicable state law;

(vi)    The agency has determined that the listed DBE subcontractor is not a responsible contractor;

(vii)   The listed DBE subcontractor voluntarily withdraws from the project and provides to you written notice of its withdrawal;

(viii)  The listed DBE is ineligible to receive DBE credit for the type of work required;

(ix)    A DBE owner dies or becomes disabled with the result that the listed DBE contractor is unable to complete its work on the contract;

(x)     Other documented good cause that that the agency determines compels the termination of the DBE subcontractor. Provided, that good cause does not exist if the prime contractor seeks to terminate a DBE it relied upon to obtain the contract so that the prime contractor can self-perform the work for which the DBE contractor was engaged or so that the prime contractor can substitute another DBE or non-DBE contractor after contract award.

171. The prime contractor must demonstrate good faith reasons for the termination.

172. None of the aforesaid reasons are applicable to PCS.

173. On or about April 14, 2015, despite the existence of the status approved by the Governmental Agencies identified above as a DBE subcontractor under WorkPartners' TPA contracts with the said agencies, PCS was orally notified by UPMC counsel that UPMC WorkPartners considered the termination of the 2006 Agreement to be the termination

of the said subcontractor arrangements.  WorkPartners counsel confirmed this in a letter sent to PCS counsel on April 16, 2015, attached hereto as **Exhibit 17**.

174. PCS believes and therefore avers that UPMC WorkPartners has also notified the said agencies of the termination of the subcontractor status of PCS under the TPA and Managed Care Contracts despite the fact that WorkPartners has used the status of PCS as a DBE to secure the contracts with the agencies.

175. PCS has requested that WorkPartners provide PCS with any communications to the agencies regarding the termination of PCS as a DBE subcontractor effective April 30, 2015, but WorkPartners has refused.

176. WorkPartners also demanded that PCS cease to communicate with the public agencies, asserting that its communications with the agencies is its proprietary and trade secret information and accused PCS of interfering with its contractual relationships.  PCS believes and therefore avers that WorkPartners lacks the unilateral authority to terminate a subcontract with a DBE subcontractor without cause and without permission from the Governmental Agency under the law and that WorkPartners effort to do so is in itself unlawful.

177. PCS believes and therefore avers that WorkPartners has falsely communicated to such public agencies that they may not, pursuant to the TPA and Managed Care Contracts, continue to utilize any of the services which PCS provides.

178. With regard to the manner in which WorkPartners does business with its self-insured clients, PCS is in fact a competitor of WorkPartners regarding the provision of panel development, injury management, triage, repricing and network discount services.

### H.  The Relevant Market and the Defendants' Anti-Competitive Conduct

179. The Defendants' anti-competitive conduct illegally affects the relevant market for providers of workers compensation cost containment services to compete.

180. The said conduct causes harm to competition as it prevents Plaintiff and others in the cost containment business from competing for the ability to provide cost containment services to employees of employers who are insured by Health Benefits or are self-insureds whose workers comp programs are managed by WorkPartners.

181. Defendant UPMC controls over 70% of the hospital beds in western Pennsylvania through its ownership of twenty hospitals and its ownership or affiliation with 5200 medical practices of which 3500 are employees of UPMC.  The hospital giant also owns UPMC Benefit Management Services, Inc., which operates UPMC WorkPartners as a third party administrator for its self-insured clients and for its workers compensation insurance company, UPMC Health Benefits, Inc.

182. In Pennsylvania, reimbursements for medical services performed at hospitals and by all other health care providers are capped at a fee schedule set forth in the Pennsylvania Workers Compensation Act.  However, acute care provided at accredited trauma center or burn facility is exempt from the medical fee caps and is reimbursed based on 100% of billed or usual and customary charges, whichever is less.

183. WorkPartners and Benefits exclusively utilize Defendant MCMC, LLC, as their provider of cost containment service, specifically repricing, excluding all other such repricing vendors, including the Plaintiff, herein.

184. Through a revenue sharing agreement with MCMC, WorkPartners permits MCMC to bill Benefits and WorkPartners TPA clients an approximate twenty-eight percent PPO access

fee for the savings derived through the application of the exclusive WorkPartners PPO network discounts.  PCS believes and therefore avers that MCMC pays a portion of the twenty-eight percent PPO access fee to WorkPartners.

185. Further, WorkPartners and Benefits allow MCMC to charge Benefits and WorkPartners' TPA clients an approximate twenty-eight percent PPO access fee for savings derived through the use of the Align PT and One Call Medical diagnostic networks.  MCMC does not pay a PPO access fee to either Align or One Call Medical for these savings and therefore PCS believes and therefore avers that MCMC pays a portion of the twenty-eight percent PPO access fee to WorkPartners.    To the contrary, PCS does not charge Benefits and WorkPartners TPA clients for the savings derived through the use of PCS' own PT and diagnostic network.  In addition, PCS does not charge Benefits and WorkPartners' TPA, clients any fees to reprice PCS PT and diagnostic network bills.   PCS believes and therefore avers that Benefits and WorkPartners insureds would realize a significant cost savings if WorkPartners utilized PCS in lieu of MCMC for the repricing of the insureds' provider bills.

186. WorkPartners does not have any such revenue sharing or kick-back agreement with any other repricing vendor other than MCMC.

**I.   The UPMC Defendants Have Agreed To Boycott PCS**

187. As a result of the conduct of Defendants as set forth above, numerous self- insured and insured employers that would prefer to purchase cost containment services from Premier Comp Solutions, LLC, have been told by WorkPartners that they are not to do business with PCS. Accordingly, they have no viable economic option other than to

purchase those products from WorkPartners and Benefits and use MCMC, LLC and Align Networks for the cost containment services.

188. As a direct and proximate result of the Defendants' anti-competitive and exclusionary conduct, PCS has been injured in its business and property, entitling it to treble damages. The Defendants' conduct has affected and, unless enjoined, will continue to injure and reduce competition in the workers' compensation cost containment services market.

189. The effect of the Defendants' conduct includes, without limitation: (a) reduction or elimination of consumer choice among competing providers; (b) increased cost; (c) foreclosure of access to superior cost containment services in the workers' compensation industry; (d) increased barriers to entry into the market; and (e) loss of competition.

190. The agreement among defendants as aforesaid is a combination in restraint of trade.

### COUNT I

### SECTION 2 OF THE SHERMAN ACT
### ATTEMPTED MONOPOLIZATION -- MONOPOLY LEVERAGING
### (AGAINST UPMC)

191.  Plaintiff incorporates paragraphs 1 through 190 contained herein by reference.

192. Upon information and belief, UPMC has attempted to monopolize the relevant products in the relevant geographic market, by using their monopoly in the provider market to create market power in the workers' compensation market.

193. UPMC had the specific intent to monopolize the relevant markets.

194. UPMC engaged in this exclusionary conduct by utilizing WorkPartners and Health Benefits.

195.  UPMC, through WorkPartners and Health Benefits, possesses sufficient market power to succeed in this anti-competitive conduct.

196. As a result PCS has lost clients and market share and continues to lose clients and market share on a daily basis and competition has been harmed.

197. As a result of this illegal activity, competition has been harmed in the relevant market and the Plaintiff has sustained antitrust damages.

## COUNT II

### SHERMAN ACT § 1: GROUP BOYCOTT
### (AGAINST UPMC, UPMC HEALTH BENEFITS AND UPMC WORKPARTNERS)

198. Plaintiff incorporates paragraphs 1 through 197 herein by reference.

199. Upon information and belief, Defendants UPMC, UPMC Health Benefits and UPMC WorkPartners have together, in concert, refused to deal with the Plaintiff for the purpose of monopolizing the market and refused to permit their insureds and self-insureds to deal with Plaintiff. Specifically, WorkPartners advised customers with whom PCS had once enjoyed a long standing working relationship that PCS would be replaced as the provider of panel generation and injury management services and has instructed Health Benefits' insured employers that their employees are not to schedule appointments through PCS or utilize the PCS injury management or PT or MRI/CT discount network.  The message delivered to employers, injured employees, and insurance agents was that they were not free to do business with or to recommend PCS.

200. The purpose of this concerted action to boycott was to accomplish an anti-competitive purpose in persuading a customer to refuse to deal with PCS

201. As a result PCS has lost clients and market share and continues to lose clients and market share on a daily basis and competition has been harmed.

202. The object of the conspiracy of the defendants was illegal and the Plaintiff has been injured.

203. Defendants' anti-competitive practices have injured competition and consumers in the relevant product market, and, as a proximate result, PCS has been injured.

204. The actions of the defendants are both unreasonable and illegal *per se*

### COUNT III

### SHERMAN ACT § 2: ATTEMPTED MONOPOLIZATION (AGAINST UPMC)

205. Plaintiff incorporates herein as if fully set forth paragraphs 1 through 204.

206. Upon information and belief, UPMC has attempted to monopolize the relevant products in the relevant geographic market, through WorkPartners and Health Benefits.

207. UPMC had the specific intent to monopolize the relevant market.

208. UPMC engaged in this exclusionary conduct through WorkPartners and Health Benefits.

209. UPMC, through WorkPartners and Health Benefits, possesses sufficient market power to succeed in this anti-competitive conduct.

210. As a result PCS has lost clients and market share and continues to lose clients and market share on a daily basis and competition has been harmed.

### COUNT IV

### SHERMAN ACT §1: EXCLUSIVE DEALING (AGAINST ALL DEFENDANTS)

211. Plaintiff incorporates paragraphs 1 through 210 herein by reference.

212. The Defendants, have agreed to sell workers compensation insurance coverage upon the condition, agreement or understanding that the purchaser will not deal with PCS. As a further enticement, should a worker suffer an injury requiring treatment by a UMPC owned or controlled physician or at a UPMC-owned hospital, even though there are no limits as to the amount the hospital or physician practice can charge, charges will be

reduced by anywhere from fourteen (14) to ninety-two (92) percent below the state mandated fee schedule.

213. Further, Defendants have undertaken a scheme and strategy to prevent the fully insured and self-insured employers from dealing with Plaintiff in regard to the cost containment services which Plaintiff has previously provided to said employers for many years.

214. As a result of the exclusive dealing, competition has been substantially harmed and there has been substantial foreclosure in the marketplace that has adversely affected competition.

215. Any pro-competitive reasons for the exclusive dealing do not justify the illegal arrangements

216. The UPMC Defendants agreement to exclude Premier violates §1 of the Sherman Act in that based upon the conduct of the Defendants by letter and oral and written communications to PCS' employer clients that they are not do business with the Plaintiff when the employer clients otherwise would have full right to do business with the Plaintiff.

## COUNT V

## SHERMAN ACT §1: COMBINATION IN RESTRAINT OF TRADE
## (AGAINST ALL DEFENDANTS)

217. Plaintiff incorporates paragraphs 1 through 216 herein by reference.

218. Defendants have conspired to restrain trade, in violation of Section 1 of the Sherman Act. MCMC, LLC and Align are vendors independent from the UPMC defendants.

219. Specifically, WorkPartners employees, by misrepresentation, acquired inside information from plaintiff PCS concerning how PCS did business, audited medical bills and developed and maintained its panels.

220. WorkPartners' employees, by various misrepresentations, acquired trade secret information from PCS which information it has used and continues to use to enable it to replace PCS as a panel generator and injury manager without having to spend the money and engage in the work necessary to identify and vet the panel providers who may be used to make up the panels which PCS has generated.

221. Once all of Plaintiff's trade secrets had been divulged to WorkPartners, WorkPartners severed all relationships with PCS, and was then able to use the information to provide panel generation and injury management to PCS' former insured and self-insured employer clients.

222. WorkPartners, in violation of the 2006 Agreement, divulged the repricing and medical bill review know-how to MCMC, PCS' competitor  This constitutes a combination in restraint of trade to the extent the information was shared with anyone in conspiracy with UPMC to drive PCS from the relevant product  market.

223. The Defendants' intent was to eliminate PCS as a competitor in the relevant market.

<u>**COUNT VI**</u>

<u>**SHERMAN ACT §2: ATTEMPTED MONOP0LIZATION**</u>
<u>**(AGAINST UPMC AND UPMC WORKPARTNERS)**</u>

224. Plaintiff incorporates paragraphs 1 through 223 herein by reference.

225. Upon information and belief, UPMC has attempted to monopolize the relevant products in the relevant geographic market, through WorkPartners and Health Benefits.

226. UPMC had the specific intent to monopolize the relevant market.

227. Specifically, WorkPartners employees, by misrepresentation, acquired inside information from plaintiff PCS concerning how PCS did business, audited medical bills and developed and maintained its panels.

228. UPMC engaged in this exclusionary conduct through WorkPartners.

229. WorkPartners' employees, by various misrepresentations, acquired trade secret information from PCS which information it has used and continues to use to enable it to replace PCS as a panel generator and injury manager without having to spend the money and engage in the work necessary to identify and vet the panel providers who may be used to make up the panels which PCS has generated.

230. Once all of Plaintiff's trade secrets had been divulged to WorkPartners, WorkPartners severed all relationships with PCS, and was then able to use the information to provide panel generation and injury management to PCS' former insured and self-insured employer clients.

231. WorkPartners, in violation of the 2006 Agreement, divulged the repricing and medical bill review know-how to MCMC, PCS' competitor

232.  UPMC, through WorkPartners and Health Benefits, possesses sufficient market power to succeed in this anti-competitive conduct.

233. As a result PCS has lost clients and market share and continues to lose clients and market share on a daily basis and competition has been harmed.

## COUNT VII

### COMMON LAW UNFAIR COMPETITION UNDER STATE LAW
### (AGAINST ALL DEFENDANTS)

234. The allegations contained in paragraphs 1 through 233 are incorporated herein as if set forth in full.

235. The conduct of the defendants as aforesaid constitutes common law unfair competition under the law of the Commonwealth.

236. Said conduct includes, but is not limited to, the making of misrepresentations to the insured and self-insured employers with whom Plaintiff has maintained contractual and beneficial business relationships or prospective contractual and beneficial business relationships and misappropriating confidential and trade secret information belonging to Plaintiff.

237. The conduct of defendants as aforesaid has resulted in harm to Plaintiff.

**WHEREFORE**, Plaintiff requests this Honorable Court to:

1. Enter an injunction prohibiting Defendants from interfering in the relationships between Plaintiff and the insured and self-insured employers for whom Plaintiff has been providing panel generation and injury management services;

2. Enter an injunction prohibiting Defendants from utilizing the information contained in Plaintiff's panel provider data base obtained from PCS through fraudulent misrepresentation;

3. Enter an injunction prohibiting UPMC from providing WorkPartners exclusive PPO network discounts for medical services to Health Benefits on behalf of its insureds and to self-insureds or order UPMC to provide the same discounts to employers who are insured for workers' compensation benefits by all other insurers who provide workers compensation insurance to employers in Western Pennsylvania;

4. Enter an injunction ordering WorkPartners to allow Plaintiff to access the WorkPartners PPO exclusive PPO network discounts on behalf of WorkPartners self-insured clients and all other insureds and self-insureds that are Plaintiff's clients.

5. Permit Plaintiff to provide to all employers insured by Health Benefits, self-insureds employer clients of WorkPartners, and insurance broker agencies a copy of the 18-page report in which the services of Plaintiff were rated as superior and significantly more cost effective to the services of either MCMC or Align;

6. Enter judgment in an amount equal to the lost profit and other financial damages suffered by Plaintiff as a result of the anti-competitive conduct of Defendants;

7. Enter a judgment equal to three-times the amount of the financial damages suffered by Plaintiff;

8. Enter judgment in an amount equal to Plaintiff's attorney fees and cost incurred in the prosecution of this case;

9. Order such other remedy as may be fitting and proper under the law.

**Jury Demand**

Plaintiff hereby demands a jury trial on all counts noted above.

Respectfully submitted,

STANLEY M. STEIN, P.C.

By: /s/ Stanley M. Stein
  Stanley M. Stein
  Pa ID # 10577
  445 Ft. Pitt Blvd. | Suite 150
  Pittsburgh, PA 15219
  412-904-4573 (p)
  412-904-4726 (f)
  smstein@smsteinlaw.com

By: /s/ Jeffrey S. Jacobovitz
  1775 Pennsylvania Ave, N.W.
  Suite 1000
  Washington, D.C. 20008
  202-677-4056 (p)
  404-873-8501 (f)
  Jeffrey.jacobovitz@agg.com