# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **PREMIER COMP SOLUTIONS LLC**, | ) |
| Plaintiff, | ) ) ) |
| v. | ) 2:15cv703 |
| | ) **Electronic Filing** |
| **UPMC.**, a Pennsylvania non-profit non-stock corporation, **UPMC BENEFIT MANAGEMENT SERVICES, INC.**, d/b/a UPMC WORKPARTNERS, **UPMC HEALTH BENEFITS, INC.**, d/b/a UPMC WORKPARTNERS, and, **MCMC, LLC** a wholly-owned subsidiary of York Risk Management, | ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |

## MEMORANDUM OPINION

February 18, 2016

### I. INTRODUCTION

Plaintiff, Premier Comp Solutions, LLC ("Premier" or "Plaintiff") initiated this action by filing a seven (7) count Complaint against Defendants, UPMC ("UPMC"), UPMC Benefit Management Services, Inc. ("UPMC-BMS"), UPMC Health Benefits, Inc.[1] ("UPMC-HB") (collectively the "UPMC Defendants"), and MCMC, LLC ("MCMC") (collectively the "Defendants") alleging violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 *et seq.*, violation of Section 12 of the Clayton Act, 15 U.S.C. § 22, and common law Unfair Competition. Premier contends, *inter alia*, that the Defendants conspired to drive Premier from the market in workers' compensation cost containment services. The UPMC Defendants and MCMC have filed separate Motions to Dismiss, Premier has responded and the matter is now before the Court.

---

[1] Both UPMC-BMS and UPMC-HB do business as UPMC WorkPartners ("WorkPartners"). Amended Complaint ("Am. Compl.") ¶¶ 17 & 18.

## II. STATEMENT OF THE CASE

Premier provides cost containment services to workers' compensation insurers and third party administrative ("TPA") service providers in twenty-one (21) states including Pennsylvania. Am. Compl. ¶¶ 20, 21 & 25. The services provided by Premier include:

(1) Panel Development – Premier develops customized panel listings of healthcare providers to be used by employees with work-related injuries or illnesses. The panels are posted at the employer's workplace and are comprised of healthcare providers who are geographically located near the workplace;

(2) Injury Management- Premier provides the injured workers with assistance in scheduling appointments for medical treatment with panel providers, and provides the employer and claims adjuster with information regarding diagnosis, treatment and work status;

(3) Medical Bill Review – Medical Bill Review and Repricing ("Repricing") includes reviewing the provider's documentation to assure it supports the billed charges, reducing the provider's bills to the amounts allowed under the appropriate state's workers' compensation fee schedules. Premier reprices the provider's bills and generates Explanation of Reimbursement ("EOR") forms which reflect the provider's billed charges, workers' compensation fee schedule reductions, medical review reductions, Preferred Provider Organization ("PPO") discounts and amounts payable to the provider.

(4) Physical Therapy and Diagnostic Network Access – Premier is a party to direct discount contracts with several healthcare providers who render services in the fields of physical therapy and MRI/CT, which allows Premier to offer discounts below the mandated workers' compensation fee schedules to its clients for such services.

Am. Comp. ¶ 28. Premier also has Preferred Provider Organization ("PPO") network access contracts with the Coventry Health Care ("Coventry") network and the Prime Health Services ("Prime") network which allows Premier to obtain PPO discounts for its repricing clients on medical services rendered by network providers. Am. Compl. ¶¶ 21, 23 & 24.

UPMC-BMS, doing business as WorkPartners, provides TPA and other services related to workers' compensation claims to insured and uninsured employers. Am. Comp. ¶ 17. In 2010, UPMC-HB, also doing business as WorkPartners, was approved as a workers' compensation insurance carrier in Pennsylvania and began to sell workers' compensation insurance, as well as to provide other related services, to employers in Pennsylvania. Am. Comp. ¶¶ 18 & 55.

MCMC, a wholly-owned subsidiary of York Risk Services Group ("York"), and with the exception of WorkPartner's TPA clients Allegheny County, the Port Authority, the City of Pittsburgh and the Pennsylvania Turnpike Commission, has always provided repricing services for WorkPartners and UPMC-HB. Am. Comp. ¶¶ 19 & 32. Premier alleges that MCMC provides repricing services to WorkPartners' and UPMC-HB's self-insured employers under the provisions of a 2009 contract which requires MCMC to pay WorkPartners a percentage of the access fee which MCMC charges UPMC-HB and the self-insured employers for access to the UPMC preferred provider network. Am. Comp. ¶ 99. This kickback arrangement increases the medical costs incurred by WorkPartners' and UPMC-HB's self-insured employers. *Id.*

In April of 2006, Premier entered into a Medical Review and Repricing Agreement (the "Repricing Agreement") with WorkPartners under which it agreed to review and reprice medical bills submitted by WorkPartners in accordance with the Pennsylvania Workers' Compensation Act (the "Act"). Am. Comp. ¶¶ 52 & 53, and Exhibit 1. The Repricing Agreement was to remain in effect "until terminated by either party . . . at any time, provided that at least 30 days advance notice is given." Am. Comp. Exhibit 1, p. 3. The parties to the Repricing Agreement, further agreed to:

> . . . hold in confidence any information obtained by relating to the business of the other and agrees to instruct its agents, employees, representatives, and independent contractors to keep all such information strictly confidential. Each

3

> party agrees that it will not directly or indirectly disclose, communicate, divulge, furnish to or use for the benefit of itself, or any other person, firm or corporation, any of the trade secrets, designs, improvements, inventions, data, information, or know-how, belonging to the other which may be communicated to it or which it may learn by virtue of its activities under this Agreement.

Am. Comp. ¶ 54, and Exhibit 1.

UPMC-HB's workers' compensation insurance policies were sold through insurance brokers, many of whom sell workers' compensation policies on behalf of other insurance companies. Am. Comp. ¶ 57. Many of the insurance brokers and carriers recommend that their insured employer clients use Premier's cost containment services. Am. Comp. ¶¶ 57 & 58.

In August of 2010, Premier began providing cost containment services to WorkPartners, including panel development, appointment scheduling, injury management, and physical therapy ("PT") and diagnostic ("MRI/CT") network services for employers who were insured by UPMC-HB. Am. Comp. ¶ 29. Premier alleges that WorkPartners, as a competitor of Premier, continued to develop its own panels for UPMC-HB's insureds located in close proximity to UPMC's hospitals and physician practices. Am. Comp. ¶¶ 29-31. In July of 2012, WorkPartners and UPMC-HB decided to use Premier's PT and MRI/CT network for the majority of their other employer clients and insureds. Am. Comp. ¶ 60. Accordingly, Premier was required to provide WorkPartners and UPMC-HB with its then current listing of PT and MRI/CT network providers and to update the list when necessary. *Id.*

In February, 2014, WorkPartners asked Premier to provide it with an "excel extract . . . with our employer clients and the providers that are listed on their panels." Am. Comp. ¶ 62; Exhibit 2. WorkPartners also requested that Premier perform an extensive medical bill review and repricing test audit to determine whether Premier or MCMC, UPMC-HB's repricing vendor at that time, provided the best service and the most savings. Am. Comp. ¶ 64. The audit also

included a review of all the services that Premier provided. Am. Comp. ¶ 65. Premier complied with WorkPartners' requests.

After Premier submitted the results of its repricing audit, WorkPartners made several inquiries regarding certain features of the audit results, including detailed explanations and supporting documentation showing why Premier denied payment for certain medical services that MCMC had allowed payment. Am. Comp. ¶ 67. Premier, however, expressed its reservations about providing responses to WorkPartners' inquiries as it was concerned the information would be provided to MCMC in order to improve MCMC's bill review performance. Am. Comp. ¶ 68. WorkPartners informed Premier that it had formed an evaluation committee to review and analyze the results of the repricing audit, and to issue a report with its findings and recommendations to its senior management personnel. Premier was assured that if it did well on the repricing audit, it had a great opportunity to get UPMC-HB's repricing business. Am. Comp. ¶ 69. Premier was later informed that its performance was superior to MCMC's on virtually every measure of competence, and that an 18 page business case study report had been issued to WorkPartners' senior management recommending that Premier be awarded the repricing medical bill review business for UPMC-HB. Am. Comp. ¶ 70.

On May 23, 2014, WorkPartners requested that Premier update the panel provider data base and that such update be in the form of an Excel spreadsheet. Am. Comp. ¶ 75; Exhibit 3. WorkPartners then requested that Premier provide it with the tax IDs and telephone numbers for each provider listed in the spreadsheet. Am. Comp. ¶ 77. Premier provided the Excel spreadsheet and the other requested information. Am. Comp. ¶¶ 76 & 78. In October of 2014, WorkPartners requested additional information from Premier's panel provider database, including a "unique identifier" for each employer, each panel and each provider. Am. Comp. ¶ 82; Exhibit 5. Again, Premier complied with the request, providing a spreadsheet containing Premier's unique keys for

5

the employers, the panels and the providers for the panels which Premier developed and managed for WorkPartners and UPMC-HB. Am. Comp. ¶ 83.

In November of 2014, after receiving all of Premier's medical provider data, WorkPartners advised Premier that MCMC, and not Premier, would receive the UPMC-HB repricing contract. Am. Comp. ¶ 87. Premier was also informed that UPMC-HB decided to begin using Align Network ("Align") for all of its insureds' new panel development, PT and MRI/CT services. *Id.* WorkPartners refused to give Premier a reason for its decisions. *Id.* Premier alleges that one of the reasons WorkPartners decided to use MCMC as its repricing vendor was because WorkPartners would have lost the PPO access revenue MCMC kicked back to it if it chose Premier. Am. Comp. ¶ 99.

Premier contends that WorkPartners not only used the information from Premier's repricing test audit for its own benefit, it also shared it with MCMC in order to improve MCMC's bill review and repricing competence. Am. Comp. ¶ 89. Further, while WorkPartners was requesting Premier's panel provider data base, UPMC-HB was using the information to develop panels in-house and/or was referring its requests for panel development to MCMC and/or Align[2]. Am. Comp. ¶ 90. In fact, WorkPartners admitted that Align had been doing panel development for UPMC-HB since August 27, 2014. Am. Comp. ¶ 92.

Despite WorkPartners' decision to use MCMC and Align as set forth above, it sent Premier a proposed Master Services Agreement ("MSA") on February 17, 2015, seeking to have Premier become one of its medical bill repricing and panel generation vendors. Am. Comp. ¶ 93. Premier determined that the MSA would have effectively required it to give WorkPartners all of

---

[2] After receiving panel referrals from UPMC-HB on a weekly basis, Premier received no panel referrals from UPMC-HB after August 27, 2014. Am. Comp. ¶¶ 79-81, 90.

its trade secret electronic data. Am. Comp. ¶ 94. Premier, therefore, rejected the MSA. *Id*. Premier contends that WorkPartners did not require any other vendor, including MCMC and Align, to execute a vendor contract similar to the MSA. Am. Comp. ¶¶ 95 & 97. Moreover, Align provides panel development services to WorkPartners' self-insured employers and to UPMC-HB's insured employers without a written agreement, but WorkPartners and UPMC-HB tell their insureds that they cannot use a Premier managed panel because Premier is not a contracted vendor of WorkPartners, and therefore, is not considered an approved panel. Am. Comp. ¶ 98. Premier further alleges that WorkPartners never intended to use its services under the MSA, but attempted to induce Premier to sign the MSA so WorkPartners would not have to return the provider panel data base information to Premier, or reveal that it had used the provider panel data base information improperly. Am. Comp. ¶ 101.

On February 17, 2015, Premier sent an e-mail to WorkPartners requesting that the electronic data be returned and that WorkPartners provide a certification that none of the data had been provided to Align or had been otherwise used improperly. Am. Comp. ¶ 103. WorkPartners did not respond to the email, the electronic data was never returned and no certification was received. Am. Comp. ¶ 104.

By letter dated March 26, 2015, WorkPartners' President, David M. Weir ("Weir"), terminated the 2006 Repricing Agreement with Premier effective April 30, 2015. Am. Comp. ¶ 112; Exhibit 8. As a result of the termination of the relationship between Premier and WorkPartners, Premier and WorkPartners have become competitors, and Defendants have adversely affected such competition as follows:

(1) WorkPartners represents to the employees of UPMC-HB's insured employers that the amount of their premiums will increase if they do not use provider panels approve by WorkPartners and/or UPMC-HB;

7

> (2) WorkPartners directs that UPMC-HB's insured employers use the PT services of Centers for Rehab Services ("CRS"), a company that is one hundred (100%) percent owned by UPMC;
>
> (3) WorkPartners directs that UPMC-HB's insured employers use the MRI services of UPMC's own diagnostic testing facilities; and
>
> (4) WorkPartners mandates that UPMC-HB's insureds utilize "WorkPartners approved panels" which include either UPMC-owned PT and MRI network facilities or include Align PT and One Call diagnostic networks or a combination thereof.

Am. Comp. ¶¶ 106 & 107.

### III. LEGAL STANDARD FOR MOTION TO DISMISS

A motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of a complaint. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). Under Rule 8 of the Federal Rules of Civil Procedure, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). A complaint must be dismissed for failure to state a claim if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007); *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1960, 173 L. Ed. 2d 868 (May 18, 2009); *see also Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). The Supreme Court explained that although a court must accept as true all of the factual allegations contained in a complaint, that requirement does not apply to legal conclusions; therefore, the pleadings must include factual allegations to support the legal claims asserted. *Ashcroft v. Iqbal*, 129 S. Ct. at 1949, 1953. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 1949 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. at 555). Further, although the focus in assessing a motion to dismiss is on the allegations set forth in the pleadings, "matters of public record, orders [and] exhibits attached to the complaint" also may be

considered. *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 n.2 (3d Cir. 1994) (citing 5A WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE, § 1357).

The United States Court of Appeals for the Third Circuit expounded on this standard stating:

> After *Iqbal*, it is clear that conclusory or "bare-bones" allegations will no longer survive a motion to dismiss: "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. To prevent dismissal, all civil complaints must now set out "sufficient factual matter" to show that the claim is facially plausible. This then "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." The Supreme Court's ruling in *Iqbal* emphasizes that a plaintiff must show that the allegations of his or her complaints are plausible.

*Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citations omitted). In light of *Iqbal*, the *Fowler* court then set forth a two-prong test to be applied by the district courts in deciding motions to dismiss for failure to state a claim. First, the district court must accept all well-pleaded facts as true and discard any legal conclusions contained in the complaint. *Fowler v. UPMC Shadyside*, 578 F.3d at 210-211. Next, the court must consider whether the facts alleged in the Complaint sufficiently demonstrate that the plaintiff has a "plausible claim for relief." *Id.* at 211. To survive a motion to dismiss, a complaint must show an entitlement to relief through its facts. *Id.* (citing *Phillips v. County of Allegheny*, 515 F.3d 224, 234-35 (3d Cir. 2008). Finally, in applying this plausibility standard, the reviewing court must make a context-specific inquiry, drawing on its judicial experience and common sense. *Id.*

When addressing antitrust claims, the standard for dismissal is somewhat higher, because "summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile

9

witnesses thicken the plot." *Poller v. Columbia Broad. Sys.*, 368 U.S. 464, 473 (1962), *see also Rolite, Inc. v. Wheelabrator Envtl. Sys., Inc.*, 958 F. Supp. 992, 995 (E.D. Pa. 1997). Courts liberally construe antitrust complaints at this stage of the proceeding. *See Pennsylvania ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 179 (3d Cir. 1988). "[I]n antitrust cases . . . dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *Hosp. Bldg. Co. v. Trustees of Rex Hosp.*, 425 U.S. 738, 746 (1976). Nonetheless, the antitrust plaintiff must allege facts sufficient to overcome a motion under Rule 12(b)(6). *See Pennsylvania ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d at 179.

## IV. DISCUSSION

### 1. Premier's Antitrust Standing

The UPMC Defendants argue that the Amended Complaint fails to allege an antitrust injury, therefore Premier lacks standing and the antitrust action must be dismissed. The doctrine of antitrust standing ensures that a "plaintiff is a proper party to bring a private antitrust action." *Gulfstream III Associates, Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 425, 429 (3d Cir. 1993) (quoting *Associated General Contractors of California v. California State Council of Carpenters*, 459 U.S. 519, 535 n.31 (1983)).

In this circuit, courts consider the following factors in determining whether a complainant has antitrust standing:

> (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages.

*Ethypharm S.A. France v. Abbott Laboratories*, 707 F.3d 223, 232-233 (3d Cir. 2013) (quoting *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1165–66 (3d Cir.1993)). "The second factor, antitrust injury, 'is a necessary but insufficient condition of antitrust standing.'" *Id.* at 233 (quoting *Barton & Pittinos, Inc. v. SmithKline Beecham Corp.*, 118 F.3d 178, 182 (3d Cir.1997). If antitrust injury is lacking, courts need not address the remaining factors[3]. *Id.*

Antitrust injury is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes [the] defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489 (1977). Because the antitrust laws were "enacted for the protection of competition, not competitors," *Brunswick Corp.,* 429 U.S. at 488, an antitrust plaintiff must show that he has been "adversely affected by an anticompetitive aspect of the defendant's conduct." *Atlantic Richfield Co. v. USA Petroleum, Co.,* 495 U.S. 328, 339 (1990). "'An antitrust plaintiff must prove that the challenged conduct affected the prices, quantity or quality of goods or services,' not just his own welfare." *Mathews v. Lancaster General Hospital*, 87 F.3d 624, 641 (3d Cir. 1996)(*quoting Tunis Bros. Co., Inc. v. Ford Motor Co.*, 952 F.2d 715, 728 (3d Cir.1991)). Recovery by a private plaintiff on an antitrust claim can only be had where the loss "stems from a competition-reducing aspect or effect of the defendant's behavior." *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. at 344.

In its Amended Complaint, Premier alleges more than harm to its own business, it describes the harm to competition caused by UPMC's effort to remove the low-cost containment service provider in the relevant market. In February, 2014, WorkPartners asked Premier to

---

[3] The Court notes that "the existence of antitrust injury is not typically resolved through motions to dismiss." *Schuylkill Energy Resources v. Pennsylvania Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. Pa. 1997)

perform an extensive medical bill review and repricing test audit to determine whether Premier or MCMC, UPMC-HB's repricing vendor at that time, provided the best service and the most savings. Am. Comp. ¶ 64. The results of such audit indicated that Premier's performance was superior to MCMC's on virtually every measure of competence, and that an 18 page business case study report had been issued to WorkPartners' senior management recommending that Premier be awarded the repricing medical bill review business for UPMC-HB. Am. Comp. ¶ 70. Despite such results, WorkPartners advised Premier that MCMC, and not Premier, would receive the UPMC-HB repricing contract. Am. Comp. ¶ 87. Premier alleges that one of the reasons WorkPartners decided to use MCMC as its repricing vendor was because WorkPartners would have lost the PPO access revenue MCMC kicked back to it if it chose Premier. Am. Comp. ¶ 99. Moreover, WorkPartners mandated that its TPA clients use MCMC for repricing services which resulted in those employers having to pay higher prices, saving less costs and receiving lesser quality of service. Am. Comp. ¶ 36.

As early as 2010, when Premier was providing cost containment services to WorkPartners, including panel development, WorkPartners continued to develop its own panels for UPMC-HB's insureds located in close proximity to UPMC's hospitals and physician practices. Am. Comp. ¶¶ 29-31. In 2014, while WorkPartners was requesting Premier's panel provider data base, UPMC-HB was using the information to develop panels in-house and/or was referring its requests for panel development to MCMC and/or Align. Am. Comp. ¶ 90. Moreover, Align provided panel development services to WorkPartners' self-insured employers and to UPMC-HB's insured employers without a written agreement, yet WorkPartners and UPMC-HB told their insureds that they could not use a Premier managed panel because Premier was not a contracted vendor of WorkPartners, and therefore, was not considered an approved panel. Am. Comp. ¶ 98.

Premier alleges, that as a result of such conduct, numerous self-insured and insured employers that could benefit from Premier's cost containment services, were told by WorkPartners that they could not do business with Premier. The only remaining option was to purchase those products from WorkPartners and UPMC-HB and use the cost containment services so directed. Accepting as true the factual allegations in the Amended Complaint and all reasonable inferences that can be drawn therefrom, this Court finds that Premier alleged injury is of the type for which the antitrust laws were intended to provide redress.

The UPMC Defendants also assert that Premier antitrust claims fail because it is not a competitor of the UPMC Defendants' products and services. The Court finds sufficient factual allegations in the Amended Complaint that indicate that Premier and the UPMC Defendants are competitors including, *inter alia*:

(1) WorkPartners represents to the employees of UPMC-HB's insured employers that the amount of their premiums will increase if they do not use provider panels approved by WorkPartners and/or UPMC-HB;

(2) WorkPartners directs that UPMC-HB's insured employers use the PT services of Centers for Rehab Services ("CRS"), a company that is one hundred (100%) percent owned by UPMC;

(3) WorkPartners directs that UPMC-HB's insured employers use the MRI services of UPMC's own diagnostic testing facilities; and

(4) WorkPartners mandates that UPMC-HB's insureds utilize "WorkPartners approved panels" which include either UPMC-owned PT and MRI network facilities or include Align PT and One Call diagnostic networks or a combination thereof.

Am. Comp. ¶¶ 106 & 107.

2. <u>Plausible Product or Geographic Markets</u>

Assessing antitrust injury necessarily involves consideration of the relevant product and geographic markets. *See Bocobo v. Radiology Consultants of South Jersey, P.A.*, 305 F. Supp. 2d 422, 425 (D.N.J. 2004*), aff'd*, 477 F. App'x 890 (3d Cir. 2012). Plaintiff has the burden of

defining both of these markets. *See Queen City Pizza v. Domino's Pizza*, 124 F.3d 430, 436 (3d Cir. 1997) (citing *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 482, 112 S. Ct. 2072, 119 L. Ed. 2d 265 (1992)).

The relevant product market is determined by examining "the reasonable interchangeability of use or the cross-elasticity of demand between the product itself" and its substitutes. *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 325 (1962). "Interchangeability implies that one product is roughly equivalent to another for the use to which it is put; while there may be some degree of preference for the one over the other, either would work effectively." *Queen City Pizza v. Domino's Pizza*, 124 F.3d at 437 (quoting *Allen-Myland, Inc. v. Int'l Bus. Mach. Corp.*, 33 F.3d 194, 206 (3d Cir. 1994)). Courts consider the price, use, and quality of the products. *Id.* Cross-elasticity of demand is "defined as the degree by which the amount of a product purchased will change in response to changes in its price." *SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1063 (3d Cir. 1978). A relevant product market describes those groups of producers that have the actual or potential ability to take significant amounts of business away from each other because of the similarity of their products. *Id.* "A market definition must look at all relevant sources of supply, either actual rivals or eager potential entrants to the market." *Id.*

A court may dismiss a case:

> [w]here the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted.

*Queen City Pizza v. Domino's Pizza*, 124 F.3d at 436. Antitrust claims, however, do not have a heightened pleading standard: "[d]efinition of the relevant product market often requires 'a deeply fact-intensive inquiry,' and courts are hesitant to grant motions to dismiss for failure to

plead a relevant market definition." *In re Time Warner*, 2011 U.S. Dist. LEXIS 39001, at * 27, (S.D.N.Y. April 8, 2011) (quoting *Todd v. Exxon Corp.*, 275 F.3d 191, 199-200 (2d Cir. 2001)).

Premier alleges two (2) relevant product markets:

> [B]oth insured employers who purchase workers' compensation policies and derivatively cost containment services sold by firms such as [UPMC-HB] and [UPMC-BMS] and [Premier] and self-insured employers who purchase third party administration (workers compensation) services from [UPMC-BMS] and cost-containment services that are purchased in conjunction with the administration workers compensation claims. Am. Compl. ¶ 43; and

> [M]edical services consumed by individuals receiving workers' compensation benefits. This provider market is defined by the types of medical services routinely purchased by workers compensation claimants. Am. Compl. ¶ 44.

The UPMC Defendants argue that the first product market alleged by Premier is not plausible because it "asserts a single brand market limited to the provision of cost containment for WorkPartners' insured and self-insured workers' compensation clients." UPMC Brief p. 14. In support, UPMC contends that Premier fails to allege that cost containment services provided to WorkPartners or other TPAs are materially different than those provided to other workers' compensation insurers or TPA providers. *See i.e. Green Country Food Mkt. v. Bottling Grp.*, 371 F.3d 1275, 1282 (10th Cir. 2004) ("Even where brand loyalty is intense, courts reject the argument that a single branded product market constitutes a relevant market."). UPMC further argues that Premier impermissibly combines: (1) the sale of insurance with TPA cost containment services; and (2) disparate cost containment services.

The Court disagrees. Premier has alleged sufficient facts to define the relevant market with reference to long-accepted antitrust metrics, i.e. "the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co. v. U.S.*, 370 U.S. at 325; *Tunis Bros. Co., Inc. v. Ford Motor Co.*, 952 F.2d 715, 722 (3d Cir.

1991).  In support of its contention that Paragraph 43 of the Amended Complaint defines a plausible product market, Premier argues:

> [It] has facially not alleged a single-product market, and the product market for workers compensation cost containment services is broadly defined to include all reasonably interchangeable services. Here, unlike in [*Queen City Pizza*], the proposed product market is not limited so as to exclude workers compensation cost containment services offered as part of insurance plans offered by companies other than Health Benefits or TPA services offered by companies other than WorkPartners.

Premier Brief p. 10.  The plain language of Paragraph 43 of the Amended Complaint does not describe "a single brand market limited to the provision of cost containment services only for WorkPartner's insured and self-insured workers' compensation clients."  Premier describes the relevant product market to include cost containment services "sold by firms such as [UPMC-HB] and [UPMC-BMS] and [Premier]".

Moreover, Premier argues that it has properly alleged that workers compensation cost containment services constitute a valid "cluster" market as defined by the Supreme Court in *United States v. Grinnell Corp.*, 384 U.S. 563 (1966).  There, the Supreme Court found a valid "cluster" market of central fire alarm and burglary systems which were not interchangeable or economic substitutes for an end user, stating that the Court "see[s] no barrier in combining in a single market a number of different products or services where that combination reflects commercial realities." *Id*. at 572.  The Court further suggested that distinct, non-interchangeable services could be grouped together into one market if "companies recognize that to compete effectively, they must offer all or nearly all types of service." *Id.*

Premier describes the cost containment services provided to workers' compensation insurers and TPA service providers to include: (1) panel development; (2) injury management; (3) medical bill review; and (4) physical therapy and diagnostic network access. *See* Am. Comp. ¶ 28.  The combination of such services in this instance obviously reflects Premier's belief that,

based upon commercial realities, it must offer groupings of services in order to compete in the market. Accordingly, the Court finds that, at this stage of the litigation, Premier has sufficiently identified a relevant product market.

Similarly, the Court finds that Paragraph 44 of the Amended Complaint also defines a plausible product market. The product market is defined to include medical services used by injured individuals receiving employee benefits under the Act with specific reference to Premier's panel development and maintenance services.

Further, after a comprehensive review of the pleadings, the Court finds that, at this stage of the litigation, Premier has:

   (a) Sufficiently defined the geographic market;

   (b) Alleged both market power and barriers to entry; and

   (c) Alleged anticompetitive effects and exclusionary conduct.

## V. CONCLUSION

Based on the foregoing, the motions to dismiss filed on behalf of the UPMC Defendants and MCMC will be denied. An appropriate Order follows.

Cercone J.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **PREMIER COMP SOLUTIONS LLC**, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | 2:15cv703 |
| ) | **Electronic Filing** |
| **UPMC.**, a Pennsylvania non-profit non-stock ) | |
| corporation, **UPMC BENEFIT** ) | |
| **MANAGEMENT SERVICES, INC.**, ) | |
| d/b/a UPMC WORKPARTNERS, ) | |
| **UPMC HEALTH BENEFITS, INC.**, ) | |
| d/b/a UPMC WORKPARTNERS, and, ) | |
| **MCMC, LLC** a wholly-owned subsidiary ) | |
| of York Risk Management, ) | |
| ) | |
| Defendants. ) | |

## ORDER OF COURT

AND NOW, this 18th day of February, 2016, upon consideration of Defendants' Motions to Dismiss (**Document Nos. 26 & 29**), Plaintiff's response thereto, the briefs and appendices filed in support thereof, and pursuant to Memorandum Opinion filed herewith,

IT IS HEREBY ORDERED that Defendants' Motions to Dismiss are **DENIED**. Defendants shall answer the Amended Complaint within twenty-one (21) days of the date of this Order. The Court's Case Management Order shall follow.

s/ DAVID STEWART CERCONE
David Stewart Cercone
United States District Judge

cc: Stanley M. Stein, Esquire
    Jeffrey S. Jacobovitz, Esquire
    Paul S. Mazeski, Esquire
    Daniel K. Oakes, Esquire
    Richard B. Dagen, Esquire
    Peter S. Wolff, Esquire
    Thomas G. Rohback, Esquire
    (*Via CM/ECF Electronic Mail*)