## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **PREMIER COMP SOLUTIONS LLC**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:15cv703 |
| | ) | **Electronic Filing** |
| **UPMC.**, a Pennsylvania non-profit non-stock | ) | |
| corporation, **UPMC BENEFIT** | ) | |
| **MANAGEMENT SERVICES, INC.,** | ) | |
| d/b/a UPMC WORKPARTNERS, | ) | |
| **UPMC HEALTH BENEFITS, INC.,** | ) | |
| d/b/a UPMC WORKPARTNERS, and, | ) | |
| **MCMC, LLC** a wholly-owned subsidiary | ) | |
| of York Risk Management, | ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM OPINION

March 27, 2019

## I.    INTRODUCTION

Plaintiff, Premier Comp Solutions, LLC ("Premier" or "Plaintiff"), initiated this action by filing a seven (7) count Amended Complaint against Defendants, UPMC ("UPMC"), UPMC Benefit Management Services, Inc. ("UPMC-BMS"), UPMC Health Benefits, Inc.[1] ("UPMC-HB") (collectively the "UPMC Defendants"),  and MCMC, LLC ("MCMC") (collectively the "Defendants"), alleging (1) violation of Section 2 of the Sherman Act, 15 U.S.C. §§ 1 *et seq.*, attempted monopolization against UPMC (Count I); (2) violation of Section 1 of the Sherman Act, group boycott, against the UPMC Defendants (Count II); (3) violation of Section 2 of the Sherman Act, attempted monopolization against UPMC (Count III); (4) violation of Section 1 of the Sherman Act, exclusive dealing, against all Defendants (Count IV); (5) violation of Section 1 of the Sherman Act, restraint of trade, against all Defendants (Count V); (6) violation of Section

---

[1]    Both UPMC-BMS and UPMC-HB do business as UPMC WorkPartners (hereinafter "WorkPartners"). Amended Complaint ("Am. Compl.") ¶¶ 17 & 18.

2 of the Sherman Act, attempted monopolization against UPMC and WorkPartners (Count VI);

(7) common law Unfair Competition against all Defendants (Count VII). Premier contends, *inter alia*, that the Defendants conspired to drive Premier from the market in workers' compensation cost containment services. The UPMC Defendants and MCMC have filed Motions for Summary Judgment, Premier has responded and the matter is now before the Court.


## II.    STATEMENT OF THE CASE

Premier is a limited liability company organized under the laws of the Commonwealth of Pennsylvania, located in Allegheny County, Pennsylvania. UPMC Concise Statement of Undisputed Material Facts ("UPMC CSUMF") ¶¶ 1 & 2. Premier provides cost containment services to workers' compensation insurers and third party administrative ("TPA") service providers in twenty-one (21) states including Pennsylvania. Am. Compl. ¶¶ 20, 21 & 25; UPMC CSUMF ¶ 10; Premier's Response to UPMC Concise Statement of Undisputed Material Facts ("Premier Resp.") ¶ 10. The services provided by Premier include:

(1)    Medical Bill Review and Repricing – Preferred Provider Organization ("PPO") discount network access, electronic data interface ("EDI") transfer services, and the issuance of savings reports to clients on a monthly, quarterly, and/or annual basis;

(2)    Physical Therapy ("PT") and Diagnostic ("MRI") discount network access – Scheduling of all PT/MRI appointments, verification and tracking of attendance for all appointments, PT utilization review services, obtaining all PT treatment notes and MRI imaging reports, tracking PT appointments and treatment compliance, issuance of detailed PT utilization reports for all active and discharged patients as well as PT outcomes by body part on a monthly, quarterly, and/or annual basis and the issuance of network savings reports to clients on a monthly, quarterly, and annual basis;

(3)    Panel Development - Investigation and vetting of potential panel providers for qualifications, licensing, and quality of care, providing ongoing panel maintenance, panel implementation, and verification of the accuracy of the panel provider information of all panels every six months and/or when

demographic (address, phone number, etc.) changes occur, providing customer service and receiving feedback regarding client satisfaction with all PCS services through the use of written customer surveys;

(4)    Injury Management – Scheduling of all physician, PT and MRI appointments for managed panel clients, obtaining work status information after every appointment and forwarding it to adjuster and/or employer.

UPMC CSUMF ¶ 10; Premier Resp. ¶ 10.

UPMC BMS (d/b/a WorkPartners) is a licensed TPA in Pennsylvania that originally began providing workers' compensation TPA services to UPMC entities in 1997, and later began providing workers' compensation TPA (and other) services to other public and private employers. UPMC CSUMF ¶ 40. UPMC HB (d/b/a WorkPartners) is licensed to provide workers' compensation insurance in the Commonwealth of Pennsylvania, and began selling workers' compensation insurance in Pennsylvania in 2010. UPMC CSUMF ¶¶ 42 & 43. WorkPartners uses vendors to provide *inter alia* medical bill repricing and panel generation services to its clients. MCMC Concise Statement of Undisputed Material Facts ("MCMC CSUMF") ¶ 5. Both UPMC BMS and UPMC HB are wholly owned subsidiaries of UPMC. UPMC CSUMF ¶ 44.

Medical bill review and repricing is the process by which a company reviews medical bills to ensure there are no errors in the billing and to reduce provider charges. Bills from healthcare providers for services rendered to workers' compensation claimants are reviewed to assure the providers' documentation supports their billed charges, and billed charges in excess of the amounts allowed under the appropriate state's workers' compensation fee schedule are disallowed and reduced accordingly. The repricing company then reprices the bill and generates Explanation of Reimbursement ("EOR") forms which reflect the providers' billed

charges, workers' compensation fee schedule reductions, medical bill review reductions, PPO discounts, and amounts payable to the provider. The repricing company transmits the EORs to their clients and the clients remit payment to the providers with copies of the EORs. UPMC CSUMF ¶ 15; MCMC CSUMF ¶ 2(b).

Premier performs repricing services for clients in Pennsylvania and twenty-one (21) states outside of Pennsylvania, according to the workers' compensation laws and fee schedules of those states, including the states with the largest volume, New Jersey, Maryland, Delaware, Ohio, and Utah. UPMC CSUMF ¶ 19. Premier has a PPO network access contract with the Coventry Health Care ("Coventry") workers' compensation PPO network, which is the largest such network in the nation. UPMC CSUMF ¶ 16. Premier also accesses the Prime Health Services Network ("Prime") PPO, located in Brentwood, Tennessee, which includes more than 700,000 medical service providers throughout the United States. UPMC CSUMF ¶ 17. In 2014, approximately 6.84% of Premier's overall revenue was derived from its medical bill review and repricing services. UPMC CSUMF ¶ 21.

MCMC provides medical bill review and repricing services to, among other types of customers, workers' compensation insurers, workers' compensation TPA services providers and self-insured employers. UPMC CSUMF ¶ 53. Medical bill review and repricing services for UPMC WorkPartners have always been provided by MCMC, except that Premier provided bill review and repricing for four (4) of WorkPartners' TPA clients relevant here: (1) the City of Pittsburgh; (2) Port Authority of Allegheny County; (3) Pennsylvania Turnpike Commission and (4) Allegheny County. UPMC CSUMF ¶ 55; Premier Resp. ¶ 55; MCMC CSUMF ¶¶ 7, 9 & 10. MCMC is not a panel provider and has provided no panel generation services to WorkPartners. MCMC CSUMF ¶ 11.

Though WorkPartners contends that it does not engage in or sell medical bill review and repricing services of workers' compensation medical bills, UPMC CSUMF ¶ 48, Premier contends that WorkPartners bundles services in their TPA bids to include repricing services. Premier Resp. ¶ 48. In that regard, WorkPartners does not give the employer the option to carve out the repricing services to an independent repricing vendor such as Premier. *Id.*

With regard to Premier's physical therapy and diagnostic network, Premier entered into direct discount contracts with a large number of outpatient healthcare providers who render services in the fields of physical therapy and diagnostic imaging (*e.g.* MRI and CT). UPMC CSUMF ¶ 23. These direct contract relationships form what Premier called its "PT Network" and "MRI Network" which is also referred to as its "PT/MRI Network." UPMC CSUMF ¶ 24. Premier has the largest and most extensive PT/MRI network in Pennsylvania, containing over 995 PT providers and 265 diagnostic imaging providers across the Commonwealth of Pennsylvania. UPMC CSUMF ¶ 25.

Panel development and maintenance, as practiced by Premier, is the process by which Premier develops functional and customized panel listings of healthcare providers to be utilized by employees who incur work-related injuries and illnesses. Premier assists the employer to implement a panel in compliance with Pennsylvania's Workers' Compensation Act and to understand the proper use of the panel. The panels are posted at the employer's workplace and are comprised of healthcare providers who are geographically located near the place of employment and who provide the medical services most likely to be needed by the employees of the particular employer. Premier updates and reissues the employer panels when provider demographics change and at the request of the employer. Premier verifies the accuracy of panel provider information for all its clients' panels every six months and communicates any changes to their employer and insurance carrier clients. Premier also investigates and vets potential panel

providers for qualifications, current licensing and quality of care. Premier Resp. ¶ 29. Premier generally does not earn money for this service separate from its connection with use of its PT/MRI Network. UPMC CSUMF ¶ 32. When providing its panel management product to WorkPartners, Premier earned revenue only when injured employees were scheduled with and received treatment from providers in Premier's PT/MRI Network. UPMC CSUMF ¶ 33.

WorkPartners generated provider panels for certain of its fully-insured and TPA clients located in close proximity to UPMC's hospitals and physician practices across the Commonwealth of Pennsylvania. UPMC CSUMF ¶ 45; Premier Resp. ¶ 45. WorkPartners does not generate or maintain provider panels for any employers other than its workers' compensation insurance and TPA services clients. UPMC CSUMF ¶ 47. WorkPartners contends that it does not market or sell provider panel generation or maintenance services. UPMC CSUMF ¶ 46. Employers have the right under the Workers' Compensation Act to select their own providers, which allows Premier to market its services to those employers, even if such employers are fully insured by or receive TPA services from WorkPartners. Premier Resp. ¶ 46. To prevent such competition, Premier contends that once an employer makes the decision to purchase workers' compensation insurance from WorkPartners, WorkPartners mandates that such employer use only WorkPartners approved providers. *Id.* Premier further contends that WorkPartners informed their employer-insureds that their workers' compensation premiums were based on the insureds use of WorkPartners' approved panels, which were often panels consisting of UPMC owned and affiliated providers. *Id.*

Premier's injury management services involve providing injured workers with assistance in scheduling appointments for medical treatment with panel providers, assuring the employer and claimed adjuster receive prompt diagnosis, treatment, and work status information, tracking physical therapy ("PT") treatment and reporting utilization information to the client, and

scheduling all PT and diagnostic testing ("MRI/CT") with Premier discount network providers whenever possible to maximize the cost savings for employers and insurance carriers. UPMC CSUMF ¶ 35; Premier Resp. ¶ 35. Premier schedules patients for treatment inside and outside of Pennsylvania with network medical service providers in Pennsylvania and neighboring states who provide medical services to employees of Pennsylvania employers. UPMC CSUMF ¶ 36; Premier Resp. ¶ 36.

In April of 2006, Premier entered into a Medical Review and Repricing Agreement (the "Repricing Agreement") with WorkPartners. UPMC CSUMF ¶ 59; Am. Comp. ¶ 52. Premier became a subcontractor to WorkPartners to provide medical bill review and repricing services for three of UPMC WorkPartners' TPA clients: (1) the City of Pittsburgh; (2) Port Authority of Allegheny County; and (3) Pennsylvania Turnpike Commission. UPMC CSUMF ¶ 60.

In August 2010, Premier began generating provider panels for certain of WorkPartners' new commercial insured clients. UPMC CSUMF ¶ 61. In addition to Premier's panel development, its services included appointment scheduling, injury management, and PT/MRI network services. Premier Resp. ¶ 61. During the panel generation relationship with WorkPartners, every panel developed by Premier, and the included providers, required the approval of WorkPartners' Jason Gallagher ("Gallagher"). UPMC CSUMF ¶ 62; UPMC Exs. AD, AE & AF. WorkPartners required that Premier list UPMC owned and affiliated physicians and other providers whenever geographically feasible. Premier Resp. ¶ 62.

On October 31, 2013, Linda Schmac ("Ms. Schmac"), President and co-owner of Premier, wrote an email to Deborah Mehalik, WorkPartner's Manager of Network Services ("Mehalik"), which, on its face, described inefficiencies she believed were caused by WorkPartner's use of multiple vendors for their medical review and repricing, while using Premier's generated provider panels, but not using Premier for medical review and repricing.

7

Schmac's email also appears to recommend that WorkPartners use MCMC for all its "panel development, implementation and maintenance, and PT/MRI network usage" to remedy the issues caused by multiple vendors. UPMC CSUMF ¶ 64; UPMC Ex. AH. Specifically, Ms. Schmac wrote:

> Don[2] and I have discussed this issue at length and we believe the manual processes that [WorkPartners] has had to put into place to accommodate using our panel PT/MRI network program are too prone to human error and are no longer [] in [WorkPartners'] best interest. . .

> Because [WorkPartners] does not utilize our repricing service, we do not have the ability to determine if your insureds are complying with the panels we have developed, implemented manage, and continue to maintain for [WorkPartners.] Further, we do not have the ability to capture our PT/MRI network bills through repricing. Nor do we have the ability to detect if any of our network providers inadvertently bill [WorkPartners] directly for services which could potentially result in [WorkPartners] paying both [Premier] and our network provider directly for the same services. While our network providers are contractually obligated to bill [Premier] for all services we schedule, this does happen from time to time, but can be easily detected through repricing so that our clients do not ever pay double for the services. . .

> Due to the growth of [WorkPartners] and since [WorkPartners] will not consider using our repricing service which would automate these manual processes and completely eliminate these problems, we feel it would be in [WorkPartners'] best interest to transition all of [WorkPartners'] panel development, implementation, and maintenance, and PT/MRI network usage to MCMC. [WorkPartners] has grown to the point that they need an integrated cost containment solution. Having [Premier] perform the services we do and having MCMC perform the repricing is cost prohibitive, labor intensive, and inefficient for both our organizations.

> Please understand that we absolutely loathe making this recommendation to [WorkPartners] as we sincerely enjoy working with all of you and greatly appreciate the business, and we obviously do not like having to recommend to our clients that they use our competitors' services. However, this recommendation is in the best interest of [WorkPartners] as you need a more integrated cost

---

[2]    Don Schmac ("Mr. Schmac") is the Executive Vice President and co-owner of Premier.

> containment program. As always, you can count on us to make the transition to MCMC as smooth as possible for [WorkPartners].

UPMC Ex. AH.  Upon reviewing Ms. Schmac's email, WorkPartners was concerned that Premier would discontinue its panel generation services and began exploring alternatives to Premier's panel generation services. UPMC CSUMF ¶¶ 67 & 68; MCMC CSUMF ¶ 35.

Premier, however, contends that Ms. Schmac wrote the email at Mehalik's request because Mehalik wanted to show WorkPartners' executives the inefficiency of not having one vendor providing the repricing, PT/MRI network provider services and panel generation services. Premier Response ¶ 64.  Because MCMC was allegedly double and triple paying bills and paying the full provider bill amount, Mehalik asked Ms. Schmac to send her the email so Mehalik had some leverage to convince WorkPartners to reconsider the repricing vendor. Premier Ex. 11. pp. 78-86.  Though Ms. Schmac was asking WorkPartners to transition the panels to MCMC, both Ms. Schmac and Mehalik knew that was not possible because MCMC did not provide panel generation. *Id.*

The ploy appeared to work as in January 2014, WorkPartners had Mehalik conduct a test audit and prepare an audit report that compared the relative capabilities of Premier, MCMC and another vendor, Align Networks. UPMC CSUMF ¶ 69; MCMC CSUMF ¶ 36.  Mehalik, a registered nurse, had never done an audit report before. UPMC CSUMF ¶¶ 70 & 71; MCMC CSUMF ¶ 43.  Mehalik, however, had the necessary background, experience and competency to prepare the comparative audit report. Premier Response ¶ 72.  In her report, Mehalik recommended that WorkPartners switch from MCMC to Premier and consolidate repricing and panel generation services with Premier. UPMC CSUMF ¶ 73.  WorkPartners' CEO, David Weir ("Weir"), not Mehalik, had the authority to make the final decision regarding whether to change the repricing vendor. UPMC CSUMF ¶ 77.

After the completed audit, WorkPartners continued to review and develop a revised

business model for their internal repricing, network, PPO and panel development structure.

UPMC CSUMF ¶ 76; MCMC CSUMF ¶¶ 45 & 46.  Ms. Schmac was aware that WorkPartners,

despite the audit report, continued to review and investigate all of its options.  In fact, in an email

to James Cottone and Steven Wagner of WorkPartners dated July 10, 2014, Ms. Schmac stated:

> I'm very pleased to learn that [Premier] performed well with regard to the
> repricing test audit and most importantly, that [WorkPartners] is very satisfied
> with the services we currently provide to some of your TPA clients.  . .
>
> If there is anything we can do to help [WorkPartners] with the onerous task of
> reviewing your entire repricing, network, PPO, and panel development structure,
> please do not hesitate to let me know.  . .
>
> We will remain patient while [WorkPartners] works through this grueling process
> and explores its various options.  . .

UPMC Ex. AO.  Premier was aware, then, that WorkPartners did not simply rely on Mehalik's

audit report and recommendation that Premier be given all the repricing business in its revised

business model.

On February 20, 2014, Jason Gallagher ("Gallagher"), the Medical Delivery Coordinator

at WorkPartners, requested that Premier provide WorkPartners a spreadsheet containing a list of

the provider panels of WorkPartners' insured employer clients. UPMC CSUMF ¶ 78. Prior to

requesting the provider panel information in spreadsheet form, WorkPartners already possessed a

copy of all the panels generated by Premier for WorkPartners' insured either in paper or PDF.

UPMC CSUMF ¶ 78.

Gallagher explained the purpose for his request was to assist with creating a

"provider scorecard system" for providers serving WorkPartners' insureds to "better track our

providers and which panels they reside on. All part of my project to track outcomes for our

providers." UPMC CSUMF ¶ 79.  Premier contends, however, that the real reason for

WorkPartners' requests for panel provider data was to steal Premier's confidential compilation of such data so that WorkPartners could create its own panel tool capable of allowing it to develop panels itself and terminate the services of Premier. Premier Response ¶¶ 80 & 81.

In August 2014, WorkPartners began referring new workers' compensation insured employers to Align Networks ("Align") for panel generation. UPMC CSUMF ¶ 82. On November 13, 2014, Mehalik and another WorkPartners' employees met with representatives of Premier during which Premier was informed that: (1) WorkPartners would not switch its repricing vendor for its commercial-insured business from MCMC to Premier; (2) Premier would retain its repricing business for WorkPartners' self-insured TPA clients, Allegheny County, Port Authority of Allegheny County, City of Pittsburgh, and the Pennsylvania Turnpike Commission: (3) there was an opportunity for Premier to work with UPMC WorkPartners' self-insured TPA business in the future; and (4) WorkPartners was trying another vendor for panel formation on new insured clients. UPMC CSUMF ¶¶ 83, 84, 85, 86 & 87; MCMC CSUMF ¶¶ 51 & 52.

During the meeting, Ms. Schmac accused WorkPartners of being dishonest and unethical. UPMC CSUMF ¶ 90. Soon thereafter, Mr. Schmac cut off online access to the provider panels that Premier continued to manage on behalf of WorkPartners. UPMC CSUMF ¶ 91. Because WorkPartners indicated at the meeting that it was not sure if it was going to transition the 1,100 WorkPartners insureds' panels from Premier to Align, Ms. Schmac instructed Premier employees to cease updating the WorkPartners insureds' panels until WorkPartners confirmed whether or not Premier would maintain this business. UPMC CSUMF ¶ 92; Premier Response ¶ 92. On November 26, 2014, WorkPartners informed Premier that WorkPartners had no present intention to change the current arrangement with Premier regarding the panels Premier managed on behalf of WorkPartners' insured. UPMC CSUMF ¶ 94.

On January 6, 2015, WorkPartners sent an email to Premier requesting additional "panel, provider and provider location data" from Premier for the reasons set forth in the email. UPMC CSUMF ¶ 95; UPMC Ex. AZ.  In a response email on that same day, Ms. Schmac, obviously upset at the request for addition panel data, stated:

> With all due respect, . . . it was our understanding that [WorkPartners] made the decision to use Align to create their panels, and since we have not received a panel request from [WorkPartners] since August, I would have to assume [WorkPartners] continues to use Align. That being said, I can't imagine that [WorkPartners] would expect us [to] invest tens of thousands of dollars to create special IT programs and processes for just the existing panels we manage for UPMC.

UPMC Ex. AZ. In an internal email dated January 7, 2015, Andrew Yohe ("Yohe"), a WorkPartners Vice President, advised:

> [I]f [Premier] refuses to provide the information it leaves me well beyond suspect of the actual performance of their network. As it stands, our relationship with [Premier] is one in which we are **absolutely living in the dark**. We don't know what providers our clients are using, we can't judge the performance of those providers and we don't have an effective methodology of evaluating that we're paying competitive rates within their network.
>
> Their rates and provider performance could be top notch, but I have no way of telling that. If we can't come to terms on how to obtain this data, I would suggest that we need to establish an exit strategy.

*Id.* (emphasis in original).  In an email dated January 9, 2015, Linda Schmac indicated that Premier would not provide WorkPartners the data it requested, stating:

> . . . given that [WorkPartners] has made the decision to discontinue using [Premier] for new panel development in lieu of Align, I have made the decision not to comply with [WorkPartners'] request for us to provide the extensive list of IT services you have outlined in the agenda below.

UPMC Ex. BA.

Premier admits, however, that it provided panel information and data to Wal-Mart, through its wholly owned TPA, Claimed Management Inc. ("CMI"), that allowed CMI to measure provider outcomes and utilization. UPMC CSUMF ¶ 226; Premier Response ¶ 226.

Premier also admits that it provided PT/MRI billing data to an insurer client, Brickstreet, explaining:

> the purpose of the transmission was to integrate [Premier] PT/MRI invoices electronically with Brickstreet's claim system. Had [WorkPartners] awarded [Premier] its commercial bill repricing account, [Premier] would have implemented a customized electronic interface to WorkPartners'] specifications for [Premier's] PT and MRI network invoices.

UPMC CSUMF ¶ 240; Premier Response ¶ 240. Premier acknowledged that overutilization can negatively impact cost containment, therefore, it was reasonable for a payer/insurer to be concerned about PT/MRI overutilization. UPMC CSUMF ¶¶ 230, 232; Premier Response ¶ 230.

Dr. Joseph P. Fuhr, Jr. ("Dr. Fuhr"), an economist with experience in analyzing antitrust issues in healthcare markets and identified by Premier as its expert, also agreed that it is appropriate and reasonable for workers' compensation insurers, like WorkPartners, to request such panel information and utilization data in order to: understand provider performance; determine what drives increasing physical therapy costs; and to analyze provider outcomes. UPMC CSUMF ¶¶ 233, 235. Moreover, Dr. Fuhr agreed that if a repricer, particularly one like Premier that derives revenue from utilization, refused to provide such information, it would be reasonable for an insurer to look for a different repricer. UPMC CSUMF ¶ 234.

On February 17, 2015, despite Premier's refusal to provide the data requested, WorkPartners sent Premier a draft of a non-exclusive Master Services Agreement ("MSA") to replace the Agreement that had been in place since 2006,[3] which would allow Premier to service the approximately 1100 panels it generated for WorkPartners' new commercial insured clients.

---

[3]  WorkPartners contends that on March 3, 2015, it sent MCMC and Align Networks each a draft Master Services Agreement that was substantially the same as the MSA sent to Premier. UPMC CSUMF ¶¶ 105, 106.

UPMC CSUMF ¶ 100; UPMC Ex. BC.  On February 18, 2015, Ms. Schmac replied to

WorkPartners, in relevant part:

> Given the very short amount of time you have given us to review this one-sided, unreasonable agreement (8 business days), . . . there is no way I could possibly execute this agreement by March 1.
>
> Further, no repricing vendor including your current vendor, MCMC, who accesses the Coventry PPO network and is therefore mandated to use them as a primary network could sign this without significant revisions.
>
> I will forward this agreement to our attorney, the Dept of Justice, our mutual clients, and Coventry, and I will respond back to you when I and they all have had adequate time to review it.

Premier Response ¶ 101. On February 27, 2015, without any attempted negotiation with

WorkPartners, Ms. Schmac informed WorkPartners that Premier was not willing to enter into the

proposed MSA and requested that the panel provider database requested and sent to

WorkPartners "under false pretenses" be returned "along with a statement representing that the

data has not been used for any purpose and there are no other [copies]." UPMC CSUMF ¶ 103;

Premier Response ¶ 103.  On March 26, 2015, WorkPartners provided written notice to Premier

that it would terminate the 2006 Repricing Agreement, effective April 30, 2015. UPMC CSUMF

¶ 110.

The crux of Premier's complaint, therefore, arises from WorkPartners' unilateral decision

not to consolidate its medical bill repricing and panel generation business with one vendor, but

instead, after an evaluation of its repricing and panel generation vendors, chose to consolidate all

repricing work with its incumbent provider, MCMC, and to direct its panel generation work to

non-party Align Networks.  Premier contends that such decision was made after WorkPartners

requested certain confidential panel information from Premier and despite a WorkPartners'

generated report indicating that Premier was superior to MCMC as a repricing vendor.

As an initial matter, this Court must note the Supreme Court's thoughts on vendor selection set forth in *Nynex Corp. v. Discon*, 525 U.S. 128 (1998):

> The freedom to switch suppliers lies close to the heart of the competitive process that the antitrust laws seek to encourage. *Cf. Standard Oil Co. v. United States*, 221 U.S. 1, 62 (1911) (noting "the freedom of the individual right to contract when not unduly or improperly exercised [is] the most efficient means for the prevention of monopoly"). At the same time, other laws, for example, "unfair competition" laws, business tort laws, or regulatory laws, provide remedies for various "competitive practices thought to be offensive to proper standards of business morality." 3 P. AREEDA & H. HOVENKAMP, ANTITRUST LAW P651d, p. 78 (1996). Thus, this Court has refused to apply *per se* reasoning in cases involving that kind of activity. *See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 225, 125 L. Ed. 2d 168, 113 S. Ct. 2578 (1993) ("Even an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws"); 3 AREEDA & HOVENKAMP, ANTITRUST LAW supra, P651d, at 80 ("In the presence of substantial market power, some kinds of tortious behavior could anticompetitively create or sustain a monopoly, [but] it is wrong categorically to condemn such practices . . . or categorically to excuse them").

*Id.* at 137. *See also InterVest, Inc. v. Bloomberg, L.P.*, 430 F.3d 144, 158 (3d Cir. 2003) (finding no antitrust violation where defendant made a unilateral decision not to do business with the plaintiff, but to do business with a competitor of plaintiff).


III.    LEGAL STANDARD FOR SUMMARY JUDGMENT

There is no "special burden on plaintiffs facing summary judgment in antitrust cases." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 468 (1992). A court must generally apply "the same summary judgment standards that apply in other contexts." *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 357 (3d Cir. 2004). Accordingly, a court will enter summary judgment when the evidence shows "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As in other summary judgment contexts, we "review the record as a whole and in the light most favorable to the

nonmovant, drawing reasonable inferences in its favor." *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 396 (3d Cir. 2015).

The Third Circuit, however, has recognized "an important distinction" to this general standard in antitrust cases. *In re Flat Glass Antitrust Litig.*, 385 F.3d at 357. "[A]ntitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). Specifically, "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Id.* The "acceptable inferences which can be drawn from circumstantial evidence vary with the plausibility of the plaintiff's theory and the dangers associated with such inferences." *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1232 (3d Cir. 1993). When a plaintiff's theory "makes no economic sense," therefore, the plaintiff must produce "more persuasive evidence." *In re Flat Glass Antitrust Litig.*, 385 F.3d at 357. Even with a plausible theory, however, "a plaintiff relying on ambiguous evidence alone cannot raise a reasonable inference of conspiracy sufficient to survive summary judgment." *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d at 396-397. *See also Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 513 F. Supp. 1100, 1140 (E.D. Pa. 1981) ("It is now settled that summary judgment is appropriate in those antitrust cases where plaintiffs, after having engaged in extensive discovery, fail to produce 'significant probative evidence' in support of the allegations in their complaint.") (citations omitted). The reason for this more rigorous standard is that mistaken inferences are especially costly in antitrust cases, since they could penalize desirable competitive behavior and "chill the very conduct the antitrust laws are designed to protect." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. at 594; *See also Valspar Corp. v. E. I. du Pont de Nemours & Co.*, 873 F.3d 185, 192 (3d Cir. 2017).

Notwithstanding, when the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In the language of the Rule, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P 56(e). Further, the nonmoving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion. *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir.1989) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). The non-moving party must respond by pointing to sufficient cognizable evidence to create material issues of fact concerning every element as to which the non-moving party will bear the burden of proof at trial. *Simpson v. Kay Jewelers, Div. Of Sterling, Inc.*, 142 F. 3d 639, 643 n. 3 (3d Cir. 1998), *quoting Fuentes v. Perskie*, 32 F.3d 759, 762 n.1 (3d Cir. 1994).

Further, summary judgment is not disfavored in the antitrust context. *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 73 (3d Cir. 2010)**.** The entry of summary judgment in favor of an antitrust defendant may actually be required in order to prevent lengthy and drawn-out litigation, which may have a chilling effect on competitive market forces. *See, e.g., Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 541 (2d Cir. 1993).

## IV.   DISCUSSION

### A.   General Antitrust Requirements

"For plaintiffs suing under federal antitrust laws, one of the prudential limitations is the requirement of 'antitrust standing.'" *Ethypharm S.A. Fr. v. Abbott Labs.*, 707 F.3d 223, 232 (3d Cir. 2013) (quoting *City of Pittsburgh v. W. Penn Power Co*., 147 F.3d 256, 264 (3d Cir. 1998)).

The Supreme Court has articulated several factors that guide our analysis of whether a plaintiff has antitrust standing:

> (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages.

*Ethypharm S.A. Fr. v. Abbott Labs.*, 707 F.3d at 232-33 (citing *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 545 (1983)). "The second factor, antitrust injury, 'is a necessary . . . condition of antitrust standing.' If it is lacking, [a court] need not address the remaining [] factors." *Id.* at 233 (quoting *Barton & Pittinos, Inc. v. SmithKline Beecham Corp.*, 118 F.3d 178, 182 (3d Cir. 1997)) (citation omitted). To state a viable antitrust injury, a plaintiff must generally show that it is a competitor or a consumer in the relevant product and geographic markets in which competition was adversely impacted. *See id.* Assessing antitrust injury necessarily involves consideration of the relevant product and geographic markets. *See Bocobo v. Radiology Consultants of South Jersey, P.A.*, 305 F. Supp. 2d 422, 425 (D.N.J. 2004), aff'd, 477 F. App'x 890 (3d Cir. 2012). Plaintiff has the burden of defining both of these markets. *See Queen City Pizza v. Domino's Pizza*, 124 F.3d 430, 436 (3d Cir. 1997); *Tunis Bros. Co., Inc. v. Ford Motor Co.*, 952 F.2d 715, 726 (3d Cir. 1991).

At Counts II, IV, & V of the Amended Complaint, Premier alleges violations of Section 1 of the Sherman Act. Section 1 of the Sherman Act provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. To establish a Section 1 violation, a plaintiff must prove (1) concerted action by the defendants; (2) that produced anti-

competitive effects within the relevant product and geographic markets; (3) that the concerted action was illegal; and (4) that the plaintiff was injured as a proximate result of the concerted action. *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d at 442. In order to satisfy the requirement of a "contract, combination . . . or conspiracy," there must be "some form of concerted action." *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 117 (3d Cir. 1999). "The existence of an agreement is the hallmark of a Section 1 claim." *Id.*; *see also Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 999 (3d Cir. 1994) (The "very essence of a section 1 claim . . . is the existence of an agreement.").

Further, a plaintiff must allege that there has been an antitrust injury. An antitrust injury is the type of injury that the antitrust laws were enacted to prevent - an injury to competition rather than competitors. *See Alberta Gas Chems. Ltd. v. E.I. Du Pont de Nemours and Co.*, 826 F.2d 1235, 1241 (3d Cir. 1987) ("antitrust law aims to protect competition, not competitors"). In order to allege an injury to competition, a plaintiff must allege an injury to competition in a particular relevant market. *See Eichorn v. AT & T Corp.*, 248 F.3d 131, 147-48 (3d Cir. 2001). The plaintiff bears the burden of defining the relevant market. *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d at 436.

In addition to demonstrating an agreement, the § 1 plaintiff must show that "the conspiracy to which the defendant was a party imposed an unreasonable restraint on trade." *Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 530 F.3d 204, 218 (3d Cir. 2008). In most cases, courts "apply the so-called rule of reason, a case-by-case inquiry designed to assess whether challenged conduct is an anticompetitive practice." *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d at 395.

At Counts I, III, & VI of the Amended Complaint, Premier alleges attempted monopolization in violation of Section 2 of the Sherman Act. To prevail on an attempted

monopolization claim under § 2 of the Sherman Act, a plaintiff must prove that the defendant (1) engaged in predatory or anticompetitive conduct with (2) specific intent to monopolize and with (3) a dangerous probability of achieving monopoly power. *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d at 442. As to the first element, "a firm engages in anticompetitive conduct when it attempts to exclude rivals on some basis other than efficiency" or when it competes "on some basis other than the merits." *West Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 108-109 (citing *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985).

As to the second element, a mere intention to prevail over rivals or improve market position is insufficient to show a "specific intent to monopolize." *BanxCorp v. Bankrate Inc.*, 2011 U.S. Dist. LEXIS 149912, *69 (D. N.J. 2011). "Even an intent to perform acts that can be objectively viewed as tending toward the acquisition of monopoly power is insufficient, unless it also appears that the acts were not 'predominantly motivated by legitimate business aims.'" *Penn. Dental Ass'n v. Med. Serv. Ass'n of Penn.*, 745 F.2d 248, 260-261 (3d Cir. 1984) (quoting *Times Picayune Publ'g Co. v. United States*, 345 U.S. 594, 627 (1953)). "Direct evidence of specific intent need not be shown; it may be inferred from predatory or exclusionary conduct." *Penn. Dental Ass'n v. Med. Serv. Ass'n of Penn*, 745 F.2d at 261 (citations omitted).

Determining whether the third element, a "dangerous probability of achieving monopoly power," exists, requires "inquiry into the relevant product and geographic market and the defendant's economic power in that market." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 459 (1993). As previously stated, the plaintiff has the burden of defining the market. *See Queen City Pizza v. Domino's Pizza*, 124 F.3d at 436; *Tunis Bros. Co., Inc. v. Ford Motor Co.*, 952 F.2d at 726.

B.      Market Definition

The thread common to Premier's required showing of antitrust standing, and violations of

Sections 1 and 2 of the Sherman Act is the existence of a properly defined market.  Defining the

relevant market requires identification of both the product at issue and the geographic market for

that product.  *Spectrofuge Corp. v. Beckman Instruments, Inc*., 575 F.2d 256, 276 (5th Cir.

1978). Construction of the relevant market, as well as a showing of monopoly power, must be

based on expert testimony. *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1246 (11th Cir. 2002) (citing

*Colsa Corp. v. Martin Marietta Servs., Inc*., 133 F.3d 853, 855 n.4 (11th Cir. 1998). A relevant

product market describes those groups of producers that have the actual or potential ability to

take significant amounts of business away from each other because of the similarity of their

products. *SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1063 (3d Cir. 1978). "A market

definition must look at all relevant sources of supply, either actual rivals or eager potential

entrants to the market." *Id.*

A court may dismiss a case:

[w]here the plaintiff fails to define its proposed relevant market with reference to
the rule of reasonable interchangeability and cross-elasticity of demand, or alleges
a proposed relevant market that clearly does not encompass all interchangeable
substitute products even when all factual inferences are granted in plaintiff's
favor, the relevant market is legally insufficient and a motion to dismiss may be
granted.

*Queen City Pizza v. Domino's Pizza*, 124 F.3d at 436.

"The outer boundaries of a product market are determined by the reasonable

interchangeability of use or the cross-elasticity of demand between the product itself and

substitutes for it." *Queen City Pizza v. Domino's Pizza*, 124 F.3d at 436 (quoting *Brown Shoe

Co. v. U.S.*, 370 U.S. 294, 325 (1962)).   The relevant "product market" is comprised of

"commodities reasonably interchangeable by consumers for the same purposes." *United States v. E.I. DuPont de Nemours & Co.*, 351 U.S. 377, 394 (1956). Interchangeability "implies that one product is roughly equivalent to another . . . [and] while there might be some degree of preference for the one over the other, either would work effectively." *Allen-Myland, Inc. v. Int'l Bus. Machs. Corp*., 33 F.3d 194, 206 (3d Cir. 1994). When assessing reasonable interchangeability, "[f]actors to be considered include price, use and qualities." *Tunis Bros. Co. v. Ford Motor Co*., 952 F.2d at 722. Factors that may be relevant include "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Brown Shoe Co. v. U.S*., 370 U.S. at 325.

"Cross-elasticity of demand is a measure of the substitutability of products from the point of view of buyers. More technically, it measures the responsiveness of the demand for one product [X] to changes in the price of a different product [Y]." *Mylan Pharms. Inc. v. Warner Chilcott Pub. Ltd. Co.*, 838 F.3d 421, 437 (3d Cir. 2016) (citing *Queen City Pizza v. Domino's Pizza*, 124 F.3d at 438 n.6. Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient. *Queen City Pizza v. Domino's Pizza*, 124 F.3d at 436.

Citing a California District Court case, Premier argues that calculating cross-elasticity of demand is "not an absolute requirement." *See In re Live Concert Antitrust Litig*., 863 F.

Supp. 2d 966, 984 (C.D. Cal. 2011). Instead, Premier contends that there are many other factors and "practical indicia[4]" that may be used to define the boundaries of a relevant market for antitrust purposes. *See Brown Shoe Co. v. United States*, 370 U.S. at 325 (listing such "practical indicia" as "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors"). The District Court of the District of Columbia has emphasized that evidence other than expert testimony—i.e., documents, testimony, and other forms of qualitative evidence—is relevant to determining the relevant antitrust markets. *See FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 36-37 (D.D.C. 2015) (taking expert testimony into consideration but ultimately deciding that the relevant market must comport with the "business realities" of the market under consideration); *United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 197-198 (D.D.C. 2017) (focusing on such as "defendants' own ordinary course of business operations, and the other practical indicia" to determine market definition)[5].

In defining the relevant product market, however, Premier fails to direct this Court to any evidence with regard to the *Brown Shoe* factors, any "practical indicia" that defines the boundaries of the relevant market, or the "business realities" of the market. Moreover, without quantitative analysis, Premier's expert, Dr. Fuhr defines the relevant product markets as follows:

---

[4]    The Live Concert Court specifically noted, however, that the Ninth Circuit has "never expressly held that a plaintiff (and, more specifically, a plaintiff's expert economist) can define the relevant product market exclusively by reference to these 'practical indicia.'" In re Live Concert Antitrust Litig., 863 F. Supp. 2d at 985.

[5]    Premier, however, fails to direct this Court to any Third Circuit case holding that non-quantitative *Brown Shoe* factors or the "practical indicia" and/or "real world evidence" of the District of Columbia District Court, are sufficient to define a relevant market with or without an expert.

23

In this case, there are two relevant product markets. In the first product market, there are two separate markets. The first consists of both insured employers who purchase workers' compensation policies and derivatively cost containment services. Also included in this market are self-insured employers who purchase [workers' compensation] third-party administration services from UPMC WorkPartners ("WP") and cost containment services that are purchased in conjunction with the administration of workers' compensation claims.

Cost containment constitutes a value cluster market. (Memorandum Opinion 2/18/16)[6] The cost containment services consist of panel development, telephonic injury management, PT and Diagnostic network access, and medical bill review services. A detailed description of these services is set forth in the Amended Complaint, Paragraph 28.

The second relevant product market is medical services consumed by individuals receiving workers' compensation benefits. The provider market is defined by the type of medical services routinely purchased by workers' compensation claimants.

Fuhr Report[7], ECF 274, Ex. B, p. 3. In its Amended Complaint, Premier alleges two (2) relevant product markets:

[B]oth insured employers who purchase workers' compensation policies and derivatively cost containment services sold by firms such as [UPMC-HB] and [UPMC-BMS] and [Premier] and self-insured employers who purchase third party administration (workers compensation) services from [UPMC-BMS] and cost-containment services that are purchased in conjunction with the administration workers compensation claims. Am. Compl. ¶ 43; and

[M]edical services consumed by individuals receiving workers' compensation benefits. This provider market is defined by the types of medical services routinely purchased by workers compensation claimants. Am. Compl. ¶ 44.

---

[6] This Court's Memorandum Opinion denying Defendants' motion to dismiss found at ECF 48.

[7] "When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict." In an antitrust case, an expert opinion generally must "incorporate all aspects of the economic reality" of the relevant market. *See ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 290 (3d Cir. 2012).

Because this Court was uncomfortable dismissing an antitrust case at the pleadings stage, it allowed this case to proceed to discovery, however, after years of discovery, and allowing Premier every opportunity to establish its claims, Premier offers no justification for the above-stated product markets.

Nor does this Court find any plausible support, factual or analytical, for Premier's proposed "cluster" market. Cluster markets are used as a matter of analytical convenience when all or most relevant market participants sell all or most all of the relevant products, and have similar shares in each of the segments. *See Emigra Grp., LLC v. Fragomen, Del Rey, Bernsen & Loewy*, LLP, 612 F. Supp. 2d 330, 353–55 (S.D.N.Y. 2009) (explaining cluster market rationale and requirement that "market shares and entry conditions are similar for each" clustered product). Moreover, the Supreme Court has stated that competitors "must offer all or nearly all' the types of services in the cluster. *United States v. Grinnell Corp*., 384 U.S. 563, 572 n.6 (1966).

In this instance, none of the competitors identified by Premier offer the same set of services as those Premier included in the "cluster." UPMC CSUMF ¶¶ 145-146; Premier Response ¶¶ 145-146. WorkPartners does not offer itself as a competitor in the market with respect to any cost containment services, and MCMC offers only medical bill repricing in the alleged market. This Court, therefore, finds Premier's attempts to define a relevant product market necessary to show antitrust standing, and violations of Sections 1 and 2 of the Sherman Act are legally insufficient.

Nor does the Court find that Premier has established a relevant geographic market. The relevant geographic market "is that area in which a potential buyer may rationally look for the goods or services he seeks." *Gordon v. Lewistown Hosp*., 423 F.3d 184, 212 (3d Cir. 2005). Determined within the specific context of each case, a market's geographic scope must "correspond to the commercial realities of the industry" being considered and "be economically

significant." *Brown Shoe Co. v. United States*, 370 U.S. at 336-337. "Congress prescribed a pragmatic, factual approach to the definition of the relevant market and not a formal, legalistic one." *Id.*, at 336. Courts generally measure:

> a market's geographic scope, the "area of effective competition," by determining the areas in which the seller operates and where consumers can turn, as a practical matter, for supply of the relevant product. This approach evaluates the geographic aspect of the elasticity of a specified market-that is, how far consumers will go to obtain the product or its substitute in response to a given price increase and how likely it is that a price increase for the product in a particular location will induce outside suppliers to enter that market and increase supply-side competition in that location.

*Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 227 (2d Cir. 2006) (citations omitted); *see also Atl. Exposition Servs. v. SMG*, 262 Fed. Appx. 449, 452 (3d Cir. 2008). The geographic market, therefore, is not comprised of the region in which the seller attempts to sell its product, but, rather, is comprised of the area where customers would look to buy such a product. *Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d at 726.

Premier, again without quantitative analysis, defines the relevant geographic market as western Pennsylvania[8]. Premier offers no support for its proposed geographic market, but concludes that "testimony from UPMC's own witnesses create a genuine issue of material fact[9]," stating:

> Steve Wagner, the Senior Claims Manager for WP, agreed that panel development by and for [WorkPartners] would generally have been confined to Western PA. (Ex. 73, pp. 157-58.) Also, Defendants' own expert witness, Dr. David Reitman, testified that "[he] would expect someone living in Western PA to be treated by a medical service provider most of the time in Western PA."

---

[8] In his report, Premier's expert economist provides only one unsupported sentence stating his "opinion" that the market is western Pennsylvania. Fuhr Report, ECF 274, Ex. B, p. 3.

[9] Premier also suggests that the scope of the relevant geographic market is a question of fact, and therefore an issue for the jury. In *U.S. Horticultural Supply v. Scotts Co.*, 367 Fed. App'x 305 (3d Cir. 2010), however, the Third Circuit affirmed summary judgment where the plaintiff failed to factually support its proposed geographic market. *Id.* at 311-312.

Premier Brief, p. 34. Though such statements may be true, such evidence is too simplistic and fails to account for the business realities of either the workers' compensation insurance business or the cost containment services related thereto. An insured of WorkPartner's for example who has business locations in Western Pennsylvania, Ohio and West Virginia would look for panel development in all three states[10], as an injured worker would seek to be treated by a medical provider near his home.

The geographic market for workers' compensation insurers is at least the entire state of Pennsylvania. WorkPartners is not limited to sales only to employers located in western Pennsylvania, nor are employers in western Pennsylvania limited to insurers in Premier's proposed geographic market. Employers in western Pennsylvania can and do regularly purchase insurance or TPA services from entities outside of Pennsylvania. *See* UPMC CSUMF ¶¶ 174-176.

Similarly, the relevant geographic market for TPA services for workers' compensation self-insured employers is more likely nationwide, but in the very least the full state of Pennsylvania. In fact, Premier admits that many of WorkPartners' TPA competitors, including HealthSmart Solutions, Sedgwick, Gallagher Bassett, Broadspire, PMA, York and others, are large, national companies that provide TPA services across the nation. UPMC CSUMF ¶ 179.

The Court also agrees that the relevant geographic market for the services provided by Premier is broader than western Pennsylvania. Premier provides cost containment services to

---

[10]     Premier admits that it has developed provider panels for employers throughout Pennsylvania as well as for employers located in other stated, including New Jersey, North Carolina, Ohio, Tennessee, Virginia and others. UPMC CSUMF ¶ 188. Moreover, Premier generated over 2,800 new employer panels between its termination by UPMC and early January 2017, for employers located in Pennsylvania, North Carolina, Ohio, Maryland and West Virginia. *See* UPMC CSUMF ¶¶ 211 & 212.

workers' compensation insurers and TPA services to providers in twenty-one (21) states including Pennsylvania. Am. Compl. ¶¶ 20, 21 & 25; UPMC CSUMF ¶ 10; Premier Resp. ¶ 10. Moreover, Premier's competitors for cost containment services located outside western Pennsylvania compete for customers in this area, across the entire state, and nationally. UPMC CSUMF ¶¶ 180-181.  Premier's expert, Dr. Fuhr, testified that the markets for repricing, physical therapy networks, and MRI networks are national in scope. UPMC CSUMF ¶ 186.

Premier has offered no evidence to support its proposed geographic market. Moreover, its proposed geographic market is woefully narrow, and does not represent the business realities of either the workers' compensation insurance business or the cost containment service business. Premier's proposed relevant geographic market is legally insufficient to show antitrust standing, or violations of Sections 1 and 2 of the Sherman Act.

Finally, citing *Broadcom Corp. v. Qualcomm Inc*., 501 F.3d 297, 307 (3d Cir. 2007), Premier argues that a definition of the relevant markets in this instance is unnecessary because "there is direct evidence of monopoly power." Premier Brief at 33.  Premier contends that there is sufficient evidence regarding UPMC's possession of monopoly or market power in the second product market, workers' compensation medical services.  In support, Premier directs this Court to the testimony of UPMC President and CEO Jeffrey A. Romoff before the Pennsylvania House of Representatives Insurance Committee in 2011 during which Mr. Romoff stated "Let me agree that UPMC and Highmark are both monopolies." Premier Ex. 74, pp., 65, 72-73).

Mr. Romoff's testimony, however, appears to relate to general acute care services on both the provider side (hospitals) and the insurance side. *Id.* p. 73.  There is no evidence that Mr. Romoff's statement has any relation to the markets alleged in this case. The workers' compensation medical services market proposed by Premier consists mainly of outpatient services, including PT and diagnostic services, not in-patient acute care services. *See* UPMC

CSUMF ¶¶ 163 & 164. As set forth in Section D below, Premier is unable to direct this Court to either direct or circumstantial evidence of the UPMC Defendants' monopoly power in the relevant markets proposed by Premier. Accordingly, Premier must prove the existence of a properly-defined relevant product and geographic market.

In order to succeed in showing antitrust standing, a Section 1 violation or a Section 2 violation, a plaintiff must prove the existence of a properly-defined relevant product and geographic market. *See Spectrum Sports, Inc. v. McQuillan*, 506 U.S. at 454; *Pastore v. Bell Tel. Co. of Pennsylvania,* 24 F.3d 508, 512-14 (3d Cir. 1994); *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 117 (3d Cir. 1980) (holding that proof of relevant market was critical in Section 2 attempted monopolization cases); *United States v. Microsoft Corp.*, 253 F.3d 34, 81-82 (D.C. Cir. 2001) (holding plaintiff failed to establish a dangerous probability of success because it failed to define the relevant market). Premier's failure to define the relevant markets in this instance dooms its antitrust claims, and will result in summary judgment in favor of Defendants. Notwithstanding, the Court will address the issues regarding antitrust standing and Premiers claims under Sections 1 and 2 of the Sherman Act.

C.    Antitrust Standing

In order to assert an antitrust claim, a plaintiff is required to show it has antitrust standing. *See City of Pittsburgh v. W. Penn Power Co*., 147 F.3d at 264. Antitrust injury, "is a necessary . . . condition of antitrust standing. If it is lacking, [a court] need not address the remaining [] factors." *Ethypharm S.A. Fr. v. Abbott Labs.*, 707 F.3d at 233 (quoting *Barton & Pittinos, Inc. v. SmithKline Beecham Corp.*, 118 F.3d 178, 182 (3d Cir. 1997)) (citation omitted). The threshold element of antitrust injury is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). This requirement ensures that antitrust laws

29

are enforced "for the protection of competition, not competitors." *Id.* at 488. Moreover, only anti-competitive actions between competitors give rise to Sherman Act liability. *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771 (1984); *Novak v. Somerset Hosp.*, 625 Fed. App'x at 67.

It is well established that an antitrust injury reflects an activity's anti-competitive effect on the competitive market. *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990) ("The antitrust injury requirement . . . ensures that a plaintiff can recover only if the loss stems from a competition-reducing aspect or effect of the defendant's behavior."). An antitrust plaintiff must allege not only personal harm, but also that the defendant's conduct affected the "prices, quantity or quality of goods or services" in the relevant market. *Mathews v. Lancaster Gen. Hosp.*, 87 F.3d 624, 641 (3d Cir. 1996) (citing *Tunis Bros. Co., Inc. v. Ford Motor Co.*, 952 F.2d at 728); *see also Eichorn v. AT&T Corp.*, 248 F.3d 131, 140 (3d Cir. 2001) ("[T]he antitrust laws were designed to protect market-wide anticompetitive activities").

The Third Circuit has consistently held that an individual plaintiff personally aggrieved by an alleged anti-competitive agreement has not suffered an antitrust injury unless the activity has a wider impact on the competitive market. *See, e.g., City of Pittsburgh v. West Penn Power Comp.*, 147 F.3d 256, 266-67 (3d Cir. 1998) (holding action that did not lessen competition in a "marketplace" was not antitrust injury). Premier must show, therefore, that the anticompetitive effect of WorkPartners' alleged illegal anti-competitive activity created market-wide injury in order to fall within the protections of the Sherman Act. *Eichorn v. AT&T Corp.*, 248 F.3d at 141 ("an individual plaintiff personally aggrieved by an alleged anti-competitive agreement has not suffered an antitrust injury unless the activity has a wider impact on the competitive market.").

Here, Premier has failed to demonstrate that: (1) it is a competitor of the UPMC Defendants; (2) its injury stems from a competition-reducing aspect or effect of the defendants'

behavior; (3) it was shut out of the relevant market; and (4) there was harm to competition in the relevant market.

As a vendor/service provider for WorkPartners, Premier was in a vertical relationship with WorkPartners, not a horizontal relationship, and was not a competitor. Premier does not sell workers' compensation insurance or TPA services in competition with WorkPartners. UPMC CSUMF ¶¶ 128, 142-143. Premier is not a licensed provider of health care or medical services. UPMC CSUMF ¶ 14. Further, WorkPartners does not offer any "cost containment" services other than to its own clients, and, thus, WorkPartners and Premier do not compete. UPMC CSUMF ¶¶ 150-157.

Moreover, the termination of a vendor does not produce an antitrust injury, as such Premier's harm did not result from harm associated with competitive harm to the market. To the contrary, Premier's harm was the direct result of WorkPartner's decision to hire Align to generate panels for its new insureds, and Premier's failure to negotiate and sign the MSA offered by WorkPartners in February of 2015.  WorkPartner's failure to replace its incumbent repricing vendor, MCMC, with Premier caused no harm to Premier because it cannot lose business it did not have. Further, the fact that Premier was found to be the more effective repricing vendor in Mehalik's audit report is of no moment. "Paying inflated purchasing prices to vendors, without more does not constitute an injury of the type the antitrust laws were intended to prevent." *Cottman Transmission Sys., LLC v. Kershner*, 536 F. Supp. 2d 543, 559 (E.D. Pa. 2008) (quoting *2660 Woodley Road Joint Venture v. ITT Sheraton Corp*., 369 F.3d 732, 738 (3d Cir. 2004)).

Premier has failed to show that it is foreclosed from a properly-defined relevant market. To demonstrate substantial foreclosure, a plaintiff "must both define the relevant market and

prove the degree of foreclosure.[11]" Although "[t]he test is not total foreclosure," the challenged

practices must "bar a substantial number of rivals or severely restrict the market's ambit." *United*

*States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 191 (3d Cir. 2005). Dr. Fuhr, Premier's expert, did

not opine that Premier was substantially foreclosed from any market. MCMC CSUMF ¶ 69[12];

UPMC Ex. Q, p. 318. Further, Premier admits that, other than WorkPartners, it is able to work

with employers insured by all other insurance carriers and TPA's in Pennsylvania. UPMC

CSUMF ¶ 201.  Premier also believes that it is the largest panel generator in the Commonwealth

of Pennsylvania and it currently manages as many as 20,000 active provider panels in

Pennsylvania. UPMC CSUMF ¶¶ 158 & 160.  Moreover, Premier generated over 2,800 new

employer panels between its termination by UPMC and early January 2017, for employers

located in Pennsylvania, North Carolina, Ohio, Maryland and West Virginia. UPMC CSUMF ¶¶

211 & 212.  Further, WorkPartners' termination of Premier did not prevent, or otherwise hinder,

its ability to develop its PT/MRI Network either inside or outside of Pennsylvania. UPMC

CSUMF ¶ 205. Any contention by Premier that it is foreclosed from any properly-defined

relevant market in this matter is pure fantasy.

　　　　Finally, Premier has failed to show harm to competition in the relevant market. Premier's

expert, in fact, offers no opinion as to how any relevant market was harmed by WorkPartners'

termination of Premier. *See Broadcom Corp.*, 501 F.3d at 308 ("There must be proof that

competition, not merely competitors, has been harmed"); *See also Eisai, Inc. v. Sanofi Aventis*

*U.S., LLC*, 821 F.3d 394, 403 (3d Cir. 2016) (An exclusive dealing agreement is illegal under the

---

[11]　　Premier has failed to do either in this instance.

[12]　　Premier failed to respond to ¶ 69 of MCMC's Concise Statement of Undisputed Material
Facts, therefore it is deemed admitted. *See* LCvR 56(E).

rule of reason "only if the 'probable effect' of the arrangement is to substantially lessen competition, rather than merely disadvantage rivals."). A court must also analyze the likely or actual anticompetitive effects such as whether there was reduced output, increased price, or reduced quality in goods or services.). Premier's expert described the harm to competition n this matter as follows:

> It is clear that [Premier] and competition [sic] have been severely damaged by [WorkPartners'] anticompetitive actions. The **potential elimination** of [Premier], a low-priced competitor **can lead to** less competition, less choice for the consumer and higher prices in the market and thus **has potential to harm consumers**.

Fuhr Report, ECF 274, Ex. B, pp. 10-11 (Emphasis added). Such alleged harm is pure speculation by Dr. Fuhr. Premier, in fact, was not eliminated from the market. Moreover, neither Dr. Fuhr nor Premier provides any evidence that: (1) insurance premiums have risen; (2) consumers for repricing services have been harmed, either with higher prices or reduced quality or supply; (3) TPA prices have risen; or (4) output has decreased in any relevant market. Dr. Fuhr conducted no analysis of WorkPartners' prices, nor did he show any price effect resulting from WorkPartners' use of MCMC and Align. Premier, therefore, has failed to show it has antitrust standing, and its antitrust claims fail as a matter of law.

Assuming, however, that Premier could demonstrate antitrust standing, the Court finds that its claims under Section 1 and Section 2 of the Sherman fail as a matter of law on substantive grounds.

D.      Section 2 of the Sherman Act (Counts I & III)

To prevail on an attempted monopolization claim under § 2 of the Sherman Act, a plaintiff must prove that the defendant (1) engaged in predatory or anticompetitive conduct with (2) specific intent to monopolize and with (3) a dangerous probability of achieving monopoly power. *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d at 442. Focusing on the third

element, Premier is unable to demonstrate that WorkPartners has a dangerous probability of obtaining monopoly power in a relevant market.

The question of whether a defendant had a dangerous probability of successfully monopolizing is a fact-intensive inquiry. *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d at 319. Courts are to consider factors such as the defendant's market share, the strength of the competition, likely developments in the industry, entry barriers, the nature of the defendant's anti-competitive conduct, and the elasticity of demand. *See, e.g., Pastore v. Bell Tel. Co.*, 24 F.3d at 513; *Barr Laboratories, Inc. v. Abbott Laboratories*, 978 F.2d 98, 112 (3d Cir. 1992).

Courts primarily look to the size of a defendant's market power to determine whether a defendant presents a dangerous probability of gaining monopoly power. *Pennsylvania Dental Ass'n v. Medical Serv. Ass'n of Pa.*, 745 F.2d 248, 260 (3d Cir. 1984), *cert. denied*, 471 U.S. 1016 (1985). The leading antitrust commentators have stated that "the basic thrust of the classic rule is the presumption that attempt does not occur in the absence of a rather significant market share." 3 PHILLIP AREEDA & DONALD F. TURNER, ANTITRUST LAW P 820 (1978).

Areeda and Turner have suggested a rule of thumb for determining whether a particular market share may be indicative of a dangerous probability of achieving monopoly power. *Id.* at P 835c. For defendants who control 30% or less of the relevant market, claims of attempted monopolization should be "presumptively" rejected. *Id.*; *See ID Sec. Sys. Can., Inc. v. Checkpoint Sys., Inc.*, 249 F. Supp. 2d 622, 648 (E.D. Pa. 2003) ("As a matter of law, a market share of less than 30 percent is presumptively insufficient to establish the market power that is a prerequisite to a defendant's enjoying a dangerous probability of achieving monopoly power."). Where a defendant has a market share in the range of 30-50%, attempt claims should be rejected unless the defendant's conduct strongly suggests an ability to garner monopoly power. 3 PHILLIP AREEDA & DONALD F. TURNER, ANTITRUST LAW at P 835c; *accord M&M Med. Supplies & Serv.,*

*Inc. v. Pleasant Valley Hosp., Inc.*, 981 F.2d 160, 168 (4th Cir. 1992) (en banc) ("[C]laims

involving between 30% and 50% shares should usually be rejected, except when conduct is very

likely to achieve monopoly or when conduct is invidious."); *See also Mahaska Bottling Co. v.

PepsiCo Inc.*, 271 F. Supp. 3d 1054, 1076, (S.D. Iowa 2017) (Aggregated market share of over

50% figures did not suffice to establish that PepsiCo possesses a dangerous probability of

monopolizing any market.).

Although these are not rigid rules of law, the views of these oft-cited commentators,

when applied in conjunction with prevailing case law, create a useful framework for analyzing

Section 2 claims of attempted monopolization. *See Acme Mkts. v. Wharton Hardware & Supply

Corp.*, 890 F. Supp. 1230, 1241-1242 (D. N.J. 1995). Applying this framework to the present

case, the Court concludes as a matter of law that the UPMC Defendants do not present a

dangerous probability of obtaining monopoly power based upon the undisputed facts, and giving

the Premier the benefit of favorable inferences.

Here, Premier's market definition for "cost containment" services is defined as being

"derivative" to (or supplied "in conjunction with") workers' compensation insurance and/or TPA

services. *See* Am. Compl. ¶ 43. WorkPartners competes with respect to insurance and TPA

services. WorkPartners could only harm competition in the Premier-defined "cost-containment"

services market if it possessed market power in workers' compensation insurance and TPA

services.  The record, however, fails to show that that WorkPartners has monopoly power or a

dangerous probability of achieving it.

Between 2011 and 2016, over 100 insurance carrier groups have sold workers'

compensation insurance in Pennsylvania. UPMC CSUMF ¶ 117.  WorkPartners competes

against all other workers' compensation insurance carriers in Pennsylvania, including Eastern

Alliance Group, Highmark Insurance Group, Lackawanna Insurance Group, Liberty Mutual,

PMA Insurance and Travelers, for workers' compensation insurance. UPMC CSUMF ¶¶ 118 & 119.

WorkPartners' began selling workers' compensation insurance in 2010 and did not have a market share higher than three percent (3%) in any of the years 2011 – 2015. UPMC CSUMF ¶¶ 120 & 126. In 2015, the year Premier was terminated, WorkPartners had a share of Pennsylvania workers' compensation insurance premiums between 2.5% - 2.8%, which was the the twelfth (12th) largest market share in Pennsylvania. UPMC CSUMF ¶¶ 121, 122 & 126. Moreover, even if the relevant geographic market was restricted to "western Pennsylvania," WorkPartners share of workers' compensation insurance premiums in that region was only approximately 6.1%. UPMC CSUMF ¶ 177. This Court finds that such market share is too low to create a dangerous probability of achieving monopoly.

Premier also fails to direct this Court to any evidence in the record of market shares for workers' compensation TPA services, and Dr. Fuhr did not gather any information relating to such shares, either in western Pennsylvania or any other geographic area. UPMC CSUMF ¶ 139. Accordingly, there is no basis for Premier to claim that WorkPartners holds market power or a dangerous probability of achieving a monopoly in TPA services. Similarly, Premier fails to show that the UPMC Defendants have monopoly power in the market for workers' compensation medical services. Dr. Fuhr offered no structural analysis of market for workers' compensation medical services, and included no estimates of market shares from which market power could be inferred. UPMC CSUMF ¶ 162. Further, the UPMC Defendants' inpatient revenues account for less than 14% of total workers' compensation medical expenses paid in 2015 in western Pennsylvania. UPMC CSUMF ¶ 171; UPMC Exhibit A ¶ 112.

Market share is not all determinative, however, and may be offset by other evidence bearing upon competitive conditions within the industry, such as proof that the market remains

highly competitive, that the defendant controls key materials or technology, and the presence or absence of other barriers to new market entry or expansion by existing competitors. *Race Tires Am., Inc. v. Hoosier Racing Tire Corp*., 660 F. Supp. 2d 590, 603 (W.D. Pa, 2009); *See, e.g., U.S. v. Microsoft Corp*., 253 F.3d 34, 53 (D.C. Cir. 2001) (reversing findings that Microsoft had attempted to monopolize an alleged market for internet browser software, where the government failed to either properly define the relevant market or to demonstrate the presence of substantial barriers to entry.). The large number of competitors in Pennsylvania in both the workers' compensation insurance and workers' compensation insurance TPA markets is an indication of the absence of barriers to entry in such markets. Moreover, there is no evidence of record bearing upon such competitive conditions that would indicate WorkPartners has a dangerous probability of achieving a monopoly in any of the relevant markets. Premiers failure to establish the third element of its attempted monopolization claims under § 2 of the Sherman Act dooms its claims at Counts I & III of the Amended Complaint.

    E.    <u>Section 1 of the Sherman Act (Counts II & IV)</u>

To establish a Section 1 violation, a plaintiff must prove (1) concerted action by the defendants; (2) that produced anti-competitive effects within the relevant product and geographic markets[13]; (3) that the concerted action was illegal; and (4) that the plaintiff was injured as a proximate result of the concerted action. *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d at 442. Failure to satisfy any one of these elements precludes a plaintiff from establishing a viable restraint-of-trade claim. *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 207 (3d Cir. 2005) ("Without proof of all of these elements, a Section 1 claim cannot be maintained.").

---

[13]    This Court has already found that Premier has failed in its attempt to define the relevant product and geographic markets, and has also failed to show an antitrust injury. Further analysis of Premier's alleged Section 1 claims is purely academic.

In order to satisfy the requirement of a "contract, combination . . . or conspiracy," there must be "some form of concerted action." *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 117 (3d Cir. 1999). "The existence of an agreement is the hallmark of a Section 1 claim." *Id.*; *see also Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 999 (3d Cir. 1994) (The "very essence of a section 1 claim . . . is the existence of an agreement.").

In addition to demonstrating an agreement, the § 1 plaintiff must show that "the conspiracy to which the defendant was a party imposed an unreasonable restraint on trade." *Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 530 F.3d 204, 218 (3d Cir. 2008). In most cases, courts "apply the so-called rule of reason, a case-by-case inquiry designed to assess whether challenged conduct is an anticompetitive practice." *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d at 395. Premier is unable to show either an exclusive contract, concerted action, or an unreasonable restraint of trade.

Premier alleges that WorkPartners and MCMC conspired to exclude Premier from the relevant markets. MCMC was the incumbent repricing vendor for WorkPartners, and WorkPartners refused to replace MCMC with Premier despite a WorkPartners' report that indicated Premier would be the better company to serve as WorkPartners' repricing vendor. The Sherman Act, however, "does not require competitive bidding, and a buyer can conspire with a new supplier to take the place of its present supplier." *Advanced Power Sys., Inc. v. Hi-Tech Systems, Inc.*, 801 F. Supp. 1450, 1463 (E.D. Pa. 1992). *See also, NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 137 (1998) ("the freedom to switch suppliers lies close to the heart of the competitive process that the antitrust laws seek to encourage."); *Expert Masonry, Inc. v. Boone Cnty., Ky.*, 440 F.3d 336, 345 (6th Cir. 2006)(no antitrust injury where winning bid "may not have been best bid"); *2660 Woodley Rd. Joint Venture v. ITT Sheraton Corp.*, 369 F.3d 732, 738-39 (3d Cir. 2004) (finding plaintiff who alleged kickback scheme lacked antitrust standing

because "we do not think that paying inflated purchasing prices to vendors, without more, is [antitrust injury]").

Premier offers no evidence that would convince this Court that the MSA offered to MCMC, to remain as the repricing vendor, was anything but a unilateral decision made by WorkPartners. There is no evidence of concerted action or a conspiratorial agreement between MCMC and WorkPartners to foreclose Premier from a properly defined market.

"The second requirement of a Section 1 claim, an unreasonable restraint on trade, is analyzed under either the *per se* standard or the rule of reason standard." *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011). The *per se* illegality rule "applies when a business practice 'on its face, has no purpose except stifling competition.'" *Id.* (quoting *Eichorn v. AT & T Corp.*, 248 F.3d 131, 143 (3d Cir.2001)). "*Per se* illegality 'is reserved for only those agreements that are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality.'" *Id.* at 222 (quoting *Deutscher Tennis Bund v. ATP Tour, Inc.*, 610 F.3d 820, 830 (3d Cir.2010)); *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 317 (3d Cir. 2010)). No *per se* illegality is alleged or supportable on this record.

Agreements that do not fall under *per se* illegality are analyzed under the "rule of reason" to determine whether they are an unreasonable restraint on trade. *Burtch v. Milberg Factors, Inc.*, 662 F.3d at 222. Premier the initial burden under the rule of reason[14] of showing that the alleged

---

[14]    Under the rule of reason, "the plaintiff bears an initial burden . . . of showing that the alleged combination or agreement produced adverse, anticompetitive effects within the relevant product and geographic markets." *United States v. Brown Univ.*, 5 F.3d 658, 668 (3d Cir. 1993). "The plaintiff may satisfy this burden by proving the existence of actual anticompetitive effects," or defendant's market power. *Id.* "If a plaintiff meets his initial burden of adducing adequate evidence of market power or actual anti-competitive effects, the burden shifts to the defendant to show that the challenged conduct promotes a sufficiently pro-competitive objective." *Id.* at 669. "To rebut, the plaintiff must demonstrate that the restraint is not reasonably necessary to achieve the stated objective." *Id.*

agreement produced adverse, anticompetitive effects within the relevant product and geographic markets. *Deutscher Tennis Bund v. ATP Tour, Inc.*, 610 F.3d at 830 (quoting *United States v. Brown Univ.*, 5 F.3d 658, 668 (3d Cir. 1993)). Premier may satisfy this burden by proving the existence of actual anticompetitive effects, or Defendants' market power. *Id.* As set forth in Sections C and D above, the Court has determined that Premier is unable to demonstrate any anticompetitive effects in a relevant market or that WorkPartners has market power in such market. Premier's Claim at Count IV of the Amended Complaint fails as a matter of law.

Premier also contends that UPMC, UPMC-HB and WorkPartners "have together, in concert, refused to deal with [Premier] for the purpose of monopolizing the market and refused to permit their insureds and self-insureds to deal with [Premier]." *See* Amended Complaint ¶ 199. Section 1 applies only to concerted action and does not proscribe independent action by a single entity, regardless of its purpose and effect on competition. *Am. Needle, Inc. v. NFL*, No. 08-661, 130 S. Ct. 2201, 176 L. Ed. 2d 947, 2010 U.S. LEXIS 4166, 2010 WL 2025207, at *5 (U.S. May 24, 2010); *Monsanto Co. v. Spray-Rite Serv. Corp.,* 465 U.S. 752, 761 (1984). Under *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984), in certain cases, distinct legal entities are incapable of concerted action for the purposes of § 1 and must be viewed as a single entity. Specifically, the Supreme Court held "[a parent company]and its wholly owned subsidiary [] are incapable of conspiring with each other for purposes of § 1 of the Sherman Act. To the extent that prior decisions of this Court are to the contrary, they are disapproved and overruled." *Id.* at 777. Premier admits that UPMC-HB and UPMC-BMS are wholly owned subsidiaries of UPMC. UPMC CSUMF ¶ 44; Premier Response ¶ 44. Premier's claim under Section 1 of the Sherman Act against the UPMC Defendants (Count II), therefore, fails as a matter of law.

F.    Antitrust Claims-Misappropriation of Trade Secrets (Counts V & VI)

Premier contends that the alleged misappropriation of its trade secrets by MCMC and WorkPartners effectively creates a *per se* violation of the Sherman Act. In support Premier cites to *Albert Sauter Co. v. Richard S. Sauter Co.*, 368 F. Supp. 501, 513 (E.D. Pa. 1973) and *SI Handling Sys., Inc. v. Heisley*, 658 F. Supp. 362 (E.D. Pa. 1986). The mere commission of an intentional tort, however, does not create a *per se* violation of the Sherman Act which requires a showing of anticompetitive effect and/or a restraint of trade.

The Third Circuit criticized *Sauter* and rejected the proposition that the mere intentional commission of a state tort constitutes a *per se* antitrust violation, finding that a plaintiff was required to show that the commission of a state tort constituted an unreasonable restraint of trade in order to succeed under the Sherman Act. *Franklin Music Co. v. Am. Broad. Cos*., 616 F.2d 528, 558 (3d Cir. 1979). Moreover, the *SI Handling Sys., Inc.* court specifically stated that "[t]he intent necessary for a § 1 violation, however, must be an anti-competitive intent and may not simply be inferred from what plaintiff characterizes as unlawful or 'immoral' acts designed to injure." *SI Handling Systems, Inc. v. Heisley*, 658 F. Supp. at 378. To explain the difference, the court quoted Judge Sloviter's concurrence in *Franklin Music Co.* as follows:

> There is a substantial difference between intent to injure a party which supports a tort recovery and the type of anticompetitive intent on which a Sherman Act § 1 claim can be founded. For example, if two disgruntled customers conspire to burn a department store which would, if accomplished, have the effect of destroying its business, it seems improbable that a court would hold that the intent which suffices to support a claim under state tort law is itself also enough to support a claim for violation of Section 1 of the Sherman Act. The anticompetitive intent which acts as a "surrogate for effects" must be targeted directly to the victim in its competitive aspects - injury to the victim *qua* competitor. It follows that plaintiff in this case cannot resurrect its antitrust claim because of its success before the jury on the intentional state tort claims, even though the necessary predicate of that success was the finding of an intent to injure plaintiff.

*SI Handling Systems, Inc. v. Heisley*, 658 F. Supp. at 378-379 (quoting *Franklin Music Co. v. Am. Broad. Cos.*, 616 F.2d at 556 (Sloviter, J. concurring).

More importantly, the Supreme Court agreed that business torts do not create *per se* antitrust violations:

> . . . other laws, for example, "unfair competition" laws, business tort laws, or regulatory laws, provide remedies for various "competitive practices thought to be offensive to proper standards of business morality." 3 P. AREEDA & H. HOVENKAMP, ANTITRUST LAW P651d, p. 78 (1996). Thus, this Court has refused to apply *per se* reasoning in cases involving that kind of activity. *See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 225, 125 L. Ed. 2d 168, 113 S. Ct. 2578 (1993) ("Even an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws").

*Nynex Corp. v. Discon*, 525 U.S. at 137.

Therefore, Premier is not excused from its rule of reason obligations, which require proof of relevant market definitions, market power, antitrust injury, harm to competition, and market wide price increases and quantity reductions. Because Premier in not able, nor has it attempted to, demonstrate such noncompetitive effects of the alleged misappropriation of its trade secrets, its claims set forth at Counts V and VI of the Amended Complaint also fail and will be dismissed.

G.    Unfair Competition Under State Law (Count VII)

Because the Court shall enter Summary Judgment in favor of the Defendants on all of Premier's Federal claims, the Court will decline to exercise supplemental jurisdiction over the lone state law claim.  Premier can pursue such claim in the parallel state action filed in the Court of Common Pleas of Allegheny County, Pennsylvania at No. GD-15-007247.

V.    **CONCLUSION**

Based on the foregoing, Defendants' motions for summary judgment shall be granted.

An appropriate Order follows.


s/ DAVID STEWART CERCONE
David Stewart Cercone
United States District Judge

cc:    Stanley M. Stein, Esquire
Jeffrey S. Jacobovitz, Esquire
Paul S. Mazeski, Esquire
Daniel K. Oakes, Esquire
Richard B. Dagen, Esquire
Peter S. Wolff, Esquire
Thomas G. Rohback, Esquire

(*Via CM/ECF Electronic Mail*)